## 38480. HARPER v. THE STATE.

GREGORY, Justice.

The defendant, Michael Earl Harper, was convicted by a Chatham County jury of the murder of George Mercer IV, and sentenced to life imprisonment. Prior to trial the defendant pled guilty to charges of attempted theft by extortion of money from the victim's father and was sentenced to four years imprisonment for this offense. See Code Ann. § 26-1804.

At the time of his disappearance on January 29, 1980, the victim was residing with his parents, but was preparing to move into an apartment of his own on February 11, 1980. On January 29, between 1:30 and 2:00 p.m., the victim delivered a check for the February rent to his prospective landlord. This was the last occasion on which he was seen alive.

On January 30, 1980, the victim's father, concerned that the victim had not returned home the previous evening, filed a missing person report with the Savannah Police Department. Around 8:30 a.m. on January 31, 1980, the victim's sister found two notes taped to her father's car. The first note purported to be signed by the victim and stated: "I am being kidnapped. They say they will not hurt me if you get the money they want. $42,000." At trial the victim's father testified the signature on the note was not that of his son. The second note instructed the victim's father to drop the money at a spot near

the Ogeechee River on February 2. On February 2, the victim's father received a phone call from the defendant,[1] informing him that the plans for the ransom drop had been altered and directing Mr. Mercer to a public phone booth where he would find further instructions. Pursuant to these instructions the victim's father left the money at the designated spot but it was never picked up by the defendant.[2] While the victim's father was making the drop, the defendant telephoned the victim's mother; the defendant assured Mrs. Mercer that the victim was fine, but refused to allow her to speak to him. Later that evening the defendant again telephoned the Mercer residence to say that the victim's father had "botched the job." When Mr. Mercer asked to speak to his son, the defendant answered that "he [was] not near the phone." The defendant did not telephone the Mercer residence again until February 4. At this time he directed the victim's father to a location in Savannah where Mr. Mercer found a note advising him if he refused to pay the ransom "We take [sic] your son far into the woods and slice and burn him to death. We tell him why. You get a tape of his screams." On February 5 the Mercers received another call from the defendant, who designated yet another location where the ransom money was to be taken. The victim's father followed the defendant's directions, but, again, the money was never picked up by the defendant. The FBI later returned the money to the Mercers.

On February 13, 1980, the victim's wallet and checkbook were found by a landscaper in a drainage ditch approximately 300 feet from the Spanish Villa Apartments in Savannah. On February 18, the victim's car was discovered in a parking lot at the Spanish Villa Apartments.[3] At trial a tenant of the Spanish Villa Apartments testified that he remembered first seeing the car parked there "around January 30," but, because he assumed it belonged to a new tenant, he had not been suspicious of its undisturbed presence. Finger and palm prints were lifted from the victim's car, but law enforcement officers were unable to identify them.

Numerous organized searches for the victim's body were conducted by Chatham County officials; the victim's badly decomposed body was discovered on April 26, 1980, on the outskirts of the campus of Armstrong State College. The victim was wearing a

---

[1] By this time FBI agents had been called in the case and all incoming calls to the Mercer residence were being monitored and recorded. At trial defendant admitted making all phone calls to the Mercer residence in conjunction with the extortion plot.

[2] The FBI later returned the money to the victim's father, George Mercer, III.

[3] The apartment rented by the victim was not located in the Spanish Villa complex.

blue corduroy sports coat, blue tie and slacks, but had on no shoes or belt. The victim was also wearing a manually-winding wristwatch. Testimony at trial indicated that the watch was stopped at 9:30; the calendar portion of the watch showed the numeral "29."[4]

At trial the medical examiner for Chatham County testified that the victim died from hemorrhage from a bullet wound to his right shoulder. The victim had also been shot once in the right back hip area. The medical examiner testified that, in his opinion, based on the fact that the victim's watch had stopped on the 29th day of a particular month and the state of decomposition of the victim's body and clothing, there existed "a high degree of probability" that the victim died on January 29, 1980, rather than February 29, 1980. On cross-examination the medical examiner conceded it was possible that death occurred on February 29, but "not quite as possible as January 29." He further testified that the deteriorated state of the victim's clothing was consistent with three months of decomposition, but was not consistent with two months of decomposition.

In the early morning hours of February 11, 1980, the defendant hitchhiked a ride with a man and woman traveling from St. Augustine, Florida, to Atlanta. While traveling through Henry County, Georgia, their vehicle was detained by the Henry County police for speeding and driving without lights. Upon learning that the driver did not have a valid driver's license, the police officer inquired whether the female passenger or defendant had a license. The female passenger responded that she did not; the defendant answered that his name was "Glenn Mourchison," that he did have a valid driver's license, but did not have it with him. The officer ran a license check on the defendant, but found no Georgia license issued to a Glenn Mourchison. Since there was no one licensed to drive the van, the officers impounded and inventoried the vehicle. During the search of the van, officers located the defendant's driver's license and learned of his identity; the defendant was then arrested for giving a false name. Code Ann. § 26-2506. Police also found a .22 caliber pistol under the seat on which the defendant had been sitting. Twenty-two caliber shells were found in a pocket of the defendant's trousers. Subsequently the officers made a "pat-down" search of the defendant's person and found a plastic vial containing twelve capsules of Fiorinal#3, a painkiller.

---

[4] While a law enforcement official testified that this was the time and the day of the month indicated on the watch when the victim's body was discovered, the court reporter's note in the record states that when the watch was tendered into evidence, it indicated a time of 9:22 and a date of "30."

At trial a Savannah pharmacist testified that on January 17, 1980, he had filled a prescription of Fiorinal #3 for the victim, to be used by the victim for the treatment of pain accompanying shingles. The state also offered the opinion of a ballistics expert employed by the State Crime Lab that the bullets recovered from the body of the victim had been fired from the .22 caliber pistol found in the defendant's possession.

Tamara Haymans, a Savannah resident, testified that on March 9, 1980, the defendant telephoned her from the Richmond County jail[5] and asked her to visit him. She took with her a Savannah newspaper which mentioned the defendant's friendship with the victim. She again visited the defendant on April 14 and at that time gave him an article from a Savannah paper reporting that a sheriff's posse planned to look for the victim's body along the Ogeechee River. Haymans testified that the defendant "thought [the article] was hilarious . . . He said Mercer was nowhere near the Ogeechee River." Haymans testified that when she visited the defendant "a day or so later" and informed him a posse was going to look for the victim near Armstrong State College, "he became upset." During a subsequent visit, Haymans stated, the defendant "murmured . . . I could be facing a murder charge." However, the defendant also maintained to Haymans that the victim was alive, that "hoodlums" had a contract on the victim and that these "hoodlums" were searching for the victim "in several states." The defendant also told Haymans "he could take a lie detector test and answer 'no' honestly that he didn't kill" the victim.

The defendant took the witness stand in his own behalf and testified that he did not kill the victim. He testified that in the fall of 1979, he and the victim discussed the prospect of going into business to make custom stereo speakers. They determined that selling a large quantity of marijuana would be the best way to obtain capital for the venture. The defendant testified that two men, whom he refused to name, became involved in the venture. Around mid-January, 1980, the four purchased "on credit" 100 pounds of marijuana for approximately $40,000. The marijuana was subsequently stolen and the four were unable to pay their creditors. Under considerable pressure to obtain the money, the four devised a plan to fake the kidnapping of the victim, and blackmail the victim's father for $40,000. The plan called for the victim to disappear on January 29.

---

[5] The defendant was incarcerated at the Richmond County jail at this time for reasons not fully developed in the record before us, but apparently stemming from the revocation of his probation for an unrelated offense.

From January 29 until February 8, the defendant testified, the four men lived at the Spanish Villa Apartments. The defendant testified that while he made all of the phone calls to the victim's father in conjunction with the extortion plot, he did not participate in writing any of the notes to the Mercers. He also testified that he was not present when the note purported to be signed by the victim was written and, thus, could not say whether the victim had actually signed it. The defendant testified that when the extortion plan failed, the four men decided to go their separate ways to avoid their underworld creditors and that he last saw the victim on February 8.

The defendant declined to name the other two men involved in the extortion plot because he feared personal harm if he did so. The defense introduced a letter with a Savannah postmark received by the defendant in jail, threatening his life. The defendant maintained that he had never contacted Tamara Haymans requesting that she visit him, but insisted that she had just "shown up." He admitted he found the idea of a posse looking for the victim to be "absurd" because he believed the victim to be alive and well; he maintained that he was not nervous when Haymans told him the posse was to look for the victim around Armstrong State College — "just cold." The defendant also testified that, prior to February 8, the victim had given him several Fiorinal #3 capsules for "a pain in [his] leg."

The defendant offered the testimony of the DeKalb County medical examiner that "there is no possible way" to predict the time of death from the degree of deterioration of a deceased's clothing. This witness also testified that, in his opinion, it was possible for the victim to have been alive up until March 29.

A firearms consultant testified that he had conducted a series of tests on the pistol found in the defendant's possession. He opined that there were "insufficient microscopic similarities" to conclude that the bullets removed from the victim's body were fired from the defendant's gun.

In rebuttal of defendant's statement that the victim needed money to finance the custom speaker venture, the state offered the testimony of the victim's father that, at the time of his death, the victim had access to "over $150,000" on which there were no restraints.

1. Defendant contends that the trial court erred in excluding the opinion of a psychiatrist, based on his interview with the defendant while under the influence of sodium amytal, that (a) the defendant suffered from a loss of memory and (b) the defendant told the truth when he denied murdering the victim. In the presence of the jury, the psychiatrist was permitted to testify that, "based on [his]

own interviews ... and other reports," the defendant suffered "from a defect in memory."[6] Out of the presence of the jury the psychiatrist testified that he had given the defendant a "small dosage" of sodium amytal, a so-called truth serum, in order to bring back the defendant's memory and "to find the truth." Identifying sodium amytal as "an accepted medical and psychiatric technique," the psychiatrist opined that the defendant was being truthful when, under the influence of this drug, he denied participating in the murder of the victim. The doctor also stated that he did not find that the defendant "had a loss of memory for any particular alleged act."

The trial court excluded this testimony solely on the ground that the reliability of the truth serum test had not been established with enough certainty to authorize it to be admitted in evidence. The trial judge stated that, in reaching this conclusion, he had examined the authority of other states, the majority of which excluded evidence based on "truth-serum" tests.

While defendant maintains on appeal that he sought to offer the excluded testimony for the primary purpose of showing the defendant suffered from a loss of memory, the witness was permitted to testify that, based on his examination of the defendant, it was his opinion that the defendant suffered from a lapse in memory. Defendant's real complaint is that his expert was not permitted to give his opinion that, while under the influence of a "truth-serum," the defendant truthfully denied killing the victim.

While the Georgia courts have heretofore not reached the issue of whether evidence based on a truth-serum test is admissible in evidence,[7] evidence based on another purported truth detecting device, the polygraph, is inadmissible absent stipulation by the parties. *State v. Chambers,* 240 Ga. 76 (239 SE2d 324) (1977). Also, neither psychiatric evaluations based on hypnosis nor statements made by a person while in a hypnotic trance are admissible as "the reliability of hypnosis has not been established." *Alderman v. State,* 241 Ga. 496, 510 (246 SE2d 642) (1978); *Emmett v. State,* 232 Ga. 110, 115 (205 SE2d 231) (1974).

In determining whether a given scientific principle or technique is a phenomenon that may be verified with such certainty that it is competent evidence in a court of law, trial courts have frequently

---

[6] The record indicates, however, that defendant's "defect in memory" relates to events surrounding a "possible head injury" incurred in 1978.

[7] But see, *Cross v. State,* 136 Ga. App. 400, 402 (221 SE2d 615) (1975), stating, in dicta, that a truth-serum test would not be admissible in evidence and "if admitted in evidence it would have had no probative value."

looked to see whether the technique has gained general acceptance in the scientific community which recognizes it. Frye v. United States, 293 F 1013 (D.C. Cir. 1923); *Salisbury v. State,* 221 Ga. 718 (146 SE2d 776) (1966). An evaluation of whether the principle has gained acceptance will often be transmitted to the trial court by members of the appropriate scientific community testifying as expert witnesses at trial. It has been acknowledged that certain problems inhere in determining admissibility on the basis of this process.[8] First, the expert is selected and compensated by a party seeking to demonstrate a specific premise: that the scientific principle sought to be proved either is or is not accepted in the scientific community. Such a process may result in a battle between each party's experts at trial. Also, there are limits on what any one "expert" may understand about a particular discipline. And, last, we acknowledge that wide variations in intradisciplinary opinions frequently exist.[9] After much consideration, we conclude that the Frye rule of "counting heads" in the scientific community is not an appropriate way to determine the admissibility of a scientific procedure[10] in evidence. Instead, we approve of the approach taken by the trial court in this case. We hold that it is proper for the trial judge to decide whether the procedure or technique in question has reached a scientific stage of verifiable certainty, or in the words of Professor Irving Younger, whether the procedure "rests upon the laws of nature."[11] The trial court may make this determination from evidence presented to it at trial by the parties; in this regard expert testimony may be of value. Or the trial court may base its determination on exhibits, treatises or the rationale of cases in other jurisdictions. See United States v. Lo-

---

[8] For a thorough discussion of this subject, see Harold L. Korn, "Law, Fact, and Science in the Courts," 66 Columbia L. Rev. 1080-1116 (1966); see also, Kenneth C. Davis, "Judicial Notice," 55 Columbia L. Review 945, 948-952 (1955).

[9] See Korn, 66 Columbia L. Rev. 1086-1092, supra.

[10] Defendant urges that the Frye rule has been abrogated by the Court of Appeals' decision in *Jenkins v. State,* 156 Ga. App. 387 (274 SE2d 618) (1980). In that case, the trial court admitted the results of an electrophoresis procedure, over an objection that the reliability of the procedure had not been demonstrated. In affirming the trial court, the Court of Appeals stated that "The opinion of an expert on any question of science is always admissible." We do not read this opinion, as does defendant, to mean that an expert may give an opinion based on the results of a procedure that has not been proved reliable. We are unable to determine from the Court of Appeals' opinion whether the reliability of the electrophoresis procedure was sufficiently proven at trial. Therefore we are unable to agree with defendant that the Frye rule had heretofore been modified to allow an expert opinion on a scientific procedure which the trial court has not determined to be verifiably certain.

[11] Lectures in "Evidence," Irving Younger, National Practice Institute, Continuing Professional Education Lecture Series.

pez, 328 FSupp. 1077 (E.D.N.Y. 1971); McCormick on Evidence, "Judicial Notice," p. 757, 764. The significant point is that the trial court makes this determination based on the evidence available to him rather than by simply calculating the consensus in the scientific community. Once a procedure has been recognized in a substantial number of courts, a trial judge may judicially notice, without receiving evidence, that the procedure has been established with verifiable certainty, or that it rests upon the laws of nature.

As the question before the trial court in this case had not been decided in this state, and defendant did not undertake to establish the verifiable certainty that a person will tell the truth under the influence of sodium amytal, we believe it was appropriate for the trial court to take judicial notice of the fact that a majority of jurisdictions have rejected the admissibility of the results of truth-serum tests on the ground that it has not yet been demonstrated with verifiable certainty that these tests are an accurate and reliable means of ascertaining whether a person is telling the truth. See e.g., 41 ALR3d 1369; 29 AmJur2d 923, Evidence, § 831; Cain v. State, 549 SW2d 707 (Ct. Crim. App. Tex., 1977; State v. Linn, 93 Idaho 430 (462 P2d 729) (1969); Flurry v. State, 52 Ala. App. 64 (289 S2d 632) (1973); Christopher v. State, 407 S2d 198 (Sct. Fla. 1981); People v. Cox, 85 Mich. App. 314 (271 NW2d 216) (1978).[12] Furthermore, we agree with the trial court that, until it is proven with verifiable certainty that truth serum compels a person to tell the truth, neither the results of truth-serum tests nor the opinions of experts based on the results of these tests shall be admissible in evidence.

2. Next the defendant argues that the trial court erred in denying his motion for new trial on the general grounds. We do not agree. While the evidence offered by the state to prove that defendant committed the crime was largely circumstantial, viewing the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found the defendant guilty of the murder of George Mercer IV beyond a reasonable doubt. Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

3. Defendant also argues that the trial court erred in denying his motion for acquittal at the close of the state's case. We do not agree with defendant that the state's case "raised only suspicions." Nor can we say that the "evidence introduced . . . demand[ed] a verdict of

[12] Other jurisdictions have rejected the use of a truth-serum test on the ground that it is the function of the jury to determine the truth. See, e.g., State v. Adams, 218 Kan. 495 (545 P2d 1134) (1976).

acquittal." Code Ann. § 27-1802 (a). *Wallin v. State,* 248 Ga. 29 (279 SE2d 687) (1981). The trial court properly left the resolution of the question of the defendant's guilt to the jury.

4. (a) Defendant argues that the trial court erred in not ordering the state to give him certain exculpatory information pursuant to his motion under Brady v. Maryland, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963).

Following defendant's pre-trial Brady motion, the trial court conducted an in-camera inspection of the state's file; the trial court determined certain documents contained exculpatory information and ordered the state to make them available to the defendant. Defendant now argues that information which he concedes was neither in the state's file, nor examined by the trial court in the in-camera inspection, should have been made available to him. The allegedly exculpatory information is an FBI record indicating that a key state witness, Tamara Haymans, was paid $75 in travel expenses by the FBI for her trips to Augusta to visit the defendant while he was in the Richmond County jail.

At the hearing on defendant's post-trial Brady motion,[13] the defense offered testimony from two FBI agents that there was an FBI file of approximately 1400 pages in this case; that the FBI had prepared summaries of this file which had been given to the state and made part of the state's file.[14] The FBI agent denied Haymans was an agent or informant working for the FBI. Agent McLaughlin testified that Haymans was concerned about the defendant, believing him to be innocent of the murder of the victim; that after the initial FBI information-gathering interview,[15] she approached the FBI and told them the defendant wished to see her; and that she inquired whether it would be permissible to visit the defendant in the Richmond County jail. Subsequently, Haymans reported her conversations with the defendant to the FBI. Both FBI agents maintained that Haymans was paid travel expenses as a "cooperative witness" and was not considered an informant under FBI policies. Haymans testified that she voluntarily visited the defendant, initially believing him to be innocent; that her return visits to the jail were made on her own initiative; that the FBI did not request that she ask particular

---

[13] Defendant's post-trial Brady motion and extraordinary motion for new trial were heard together.

[14] A summary of the FBI's initial interview with Haymans was included in the state's file. However, there were no records of the reports Haymans made to FBI agents following her visits with the defendant in Richmond County.

[15] The record of this interview in the state's file disclosed that Haymans identified the voice on the tapes of the extortion calls made to the Mercer residence as the voice of the defendant.

questions or seek specific information; and that she had not received any money from the FBI other than $75 for travel expenses.

" '[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' Brady v. Maryland, 373 U. S. 83, 87 (83 SC 1194, 10 LE2d 215) (1963); *Irwin v. State,* 244 Ga. 850 (262 SE2d 99) (1979). However, the Supreme Court has held that there is 'no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case.' Moore v. Illinois, 408 U. S. 786, 795 (92 SC 2562, 33 LE2d 706) (1972). The Constitution requires that, upon request by the defendant, the State disclose all favorable evidence which is material either to guilt or to punishment. '[I]mplicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial.' United States v. Agurs, 427 U. S. 97, 104 (96 SC 2392, 49 LE2d 342) (1976) . . .

" '(I)f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial.' Agurs, supra, at 112-113." *Wallin v. State,* 248 Ga. 29, supra, at 32.

We conclude the defendant has not shown that this evidence, unavailable to him at trial, would have affected the outcome of the trial. Agurs, supra, at 104.

(b) The trial court was authorized, under the facts of this case, to find that Haymans was not acting as an agent or employee of the FBI agent when she visited the defendant in the Richmond County jail. That the FBI was aware that Haymans was visiting the defendant and paid her travel expenses for these visits, without more, does not make Haymans an agent for the government. Because we conclude Haymans was not acting as an FBI agent, we find that the prophylactic warnings of Miranda v. Arizona, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966) to be inapplicable to the statements made by defendant to Haymans. Nor do we agree with defendant that he had a right to have counsel present during his visits with Haymans under the authority of United States v. Henry, 447 U. S. 264 (100 SC 2183, 65 LE2d 115) (1980). That case holds that the Sixth Amendment right to counsel attaches at a postindictment confrontation between a government agent and the accused. Even if we were to find that Haymans acted as a government agent, no charges were pending against defendant with regard to the victim's death.

(c) We cannot agree with the defendant that the trial court erred in denying his extraordinary motion for new trial based on the newly discovered evidence that the FBI paid Haymans seventy-five dollars. We are unable to say that this evidence "is so material that it would probably produce a different verdict." *Drake v. State,* 248 Ga. 891, 894 (287 SE2d 180) (1982); *Emmett v. State,* 232 Ga. 110, 117 (205 SE2d 231) (1974).

5. In his fifth enumeration of error the defendant contends that the trial court erred in denying his motion for a change of venue. At the hearing on the motion for a change of venue, defendant offered the testimony of a number of television and newspaper reporters that the case had been highly publicized by the media. Defendant also introduced over fifty newspaper articles reporting the victim's disappearance and death and the arrest of the defendant for the victim's murder. The trial court denied defendant's motion, but allowed him to renew it following voir dire of the jury.

During the sequestered voir dire defendant was permitted to extensively question the jurors concerning their exposure to publicity surrounding the case. Contrary to defendant's allegations,[16] only one juror stated that he had "made up [his] mind in the case" and would not be able to put aside his prejudices. The trial court excused this juror.

"The test as to whether pretrial publicity has so prejudiced a case that an accused can not receive a fair trial is whether the jurors summoned to try the case have formed fixed opinions as to guilt or innocence of the accused from reading such publicity." *Dampier v. State,* 245 Ga. 427, 431 (265 SE2d 565) (1980); *Messer v. State,* 247 Ga. 316, 322 (276 SE2d 15) (1981). "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective

---

[16] In his brief defendant makes oblique allegations that four other jurors indicated that they would not be able to be "fair and impartial" due to pre-trial publicity. However, one of these jurors was excused by the trial court only because she had no one else to care for her pre-school-aged children; a second was excused only because of his close relationship with the victim's family. Contrary to defendant's contention, prospective juror Byck did not state that he "might require evidence to remove previous opinions," but stated unequivocally that he had no opinions regarding the case, and that he could make a decision regarding the case based solely on the evidence. Juror Case initially stated that his relationship with the Mercer family might make it difficult to be impartial. However, he stated that, while he had read about the case, he had formed no opinion and would render a decision based on the evidence presented.

juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Irvin v. Dowd, 366 U. S. 717, 723 (81 SC 1639, 6 LE2d 751) (1961).

Sixty-two jurors were examined in this case. Only one stated that he would be unable to put aside any prejudice arising out of pre-trial publicity and render a verdict based on this evidence. He was properly excused by the trial court. This low percentage (1.6 %) of veniremen excused for prejudice "corroborates the absence of such prejudicial publicity as would require the grant of a motion for a change of venue. Murphy v. Florida, 421 U. S. 794 (95 SC 2031, 44 LE2d 589) (1975); Dick v. State, 246 Ga. 697 (273 SE2d 124) (1980) (10 percent dismissal rate corroborates absence of prejudicial bias); Green v. State, 246 Ga. 598 (272 SE2d 475) (1980) (5 percent dismissal rate corroborates absence of prejudicial bias); Collier v. State, 244 Ga. 553 (261 SE2d 364) (1979) (20 percent dismissal rate corroborates absence of prejudicial bias); Coleman v. State, 237 Ga. 84 (226 SE2d 911) (1976) (49 percent dismissal rate corroborates absence of prejudicial bias); Butler v. State, 231 Ga. 276 (201 SE2d 448) (1973) cert. den. 420 U. S. 907 (1974) (36 percent dismissal rate corroborates absence of prejudicial community bias); cf. Irvin v. Dowd, supra, (62 percent corroborates actual jury partiality).

"The defendant has failed to show that a ' "pattern of deep and bitter prejudice" ' created by the pretrial publicity was 'present throughout the community' and was reflected in the verdict reached by the jurors who tried him. Irvin v. Dowd, supra, at 727. Therefore, there is no merit to this argument." Messer v. State, supra, at pp. 322-323.

6. The defendant was arrested, following indictment, while still incarcerated in the Richmond County jail. He now complains that the denial of his request for a preliminary hearing constitutes reversible error. "[A] preliminary hearing is not a required step in a felony prosecution and . . . once an indictment is obtained there is no judicial oversight or review of the decision to prosecute because of any failure to hold a commitment hearing . . . [I]n no event will we overturn a conviction on direct appeal . . . because a commitment hearing was denied appellant." State v. Middlebrooks, 236 Ga. 52, 55 (222 SE2d 343) (1976); Natson v. State, 242 Ga. 618, 622 (250 SE2d 420) (1978); Myron v. State, 248 Ga. 120, 122 (281 SE2d 600) (1981).

7. In his seventh enumeration of error defendant argues that three jurors were improperly disqualified under Witherspoon v. Illinois, 391 U. S. 510 (88 SC 1770, 20 LE2d 776) (1968), as they were asked insufficient questions to determine whether they were

unalterably opposed to the death penalty. We do not agree. The transcript of voir dire in this case shows that each disqualified juror stated that he would not vote for the death penalty under any circumstances, regardless of the evidence offered by the state. Furthermore, having received a life sentence, defendant lacks standing to raise a Witherspoon issue. *Wallace v. State,* 246 Ga. 738, 741 (273 SE2d 143) (1980); *Pless v. State,* 231 Ga. 228 (200 SE2d 897) (1973). Nor do we agree with defendant that the practice of disqualifying jurors under Witherspoon deprives him of a jury selected from a representative cross-section of the community. See *Bowen v. State,* 244 Ga. 495, 497 (260 SE2d 855) (1979).

8. Prior to trial, defendant made a motion in limine to exclude any evidence or testimony relating to defendant's previous criminal activities which the state might attempt to prove. The trial court granted the defendant's motion except as to "the [extortion] transaction involving the Mercer family . . . so long as the evidence . . . connects the defendant Harper to the murder of the victim." Defendant argues that the trial court erred in allowing the state to present evidence of his role in the extortion attempt.

While the general rule is that a separate and independent offense is inadmissible on the prosecution for another crime, exceptions to the rule exist where there is a logical connection between the two crimes from which it can be said that proof of one crime tends to prove the other. *Joiner v. State,* 236 Ga. 580, 581 (224 SE2d 414) (1976). Such an exception exists where "the extraneous crime . . . is one of a system of mutually dependent crimes." *Natson v. State,* 242 Ga. 618, 620, supra; *Joiner v. State,* supra. Another exception exists where the extraneous crime tends to prove the defendant's motive in committing the crime charged. *Natson,* supra, at p. 620.

In this case, the state sought to prove that the defendant kidnapped the victim, held him for ransom, then murdered the victim to protect his own identity when the extortion plot failed. The state offered in evidence notes written to the victim's father, threatening the victim's life if the ransom were not paid. We agree with the state that the evidence of the extortion plot was admissible to prove the defendant's motive in murdering the victim, and that there was a logical connection and dependency between the crimes such that proof of the extortion tended to prove the murder. The trial court did not err in denying this portion of the defendant's motion in limine.

9. In enumeration of error number nine, the defendant complains of four instances wherein he maintains the state injected

his character in issue. In each instance, a state witness referred to the defendant "being in trouble" or "being in jail."[17] However, only one of the four was objected to at trial and will be considered on review.

In this instance, an FBI agent testified on rebuttal that he interviewed defendant while defendant was in the Richmond County jail. Defendant objected that the state had improperly placed his character in issue and moved for a mistrial. After a hearing out of the presence of the jury, the trial court denied the motion, but inquired whether defendant desired curative instructions. The defendant responded that he did not. The trial court nonetheless instructed the jury to disregard any testimony as to where the FBI interview with defendant took place. Defendant now maintains that the trial court erred in giving curative instructions to the jury as these served only to "highlight" the statement made by the witness.

By expert medical testimony the defense sought to prove that the victim died subsequent to February 11, for from this date until the time of the trial the defendant was incarcerated in jail. Part of the strength of the defense lay in establishing that the defendant could not have committed the crime because he was in jail at the time of its commission. Further, Tamara Haymans was permitted to testify, without objection, that when she visited the defendant in Richmond County, he was "in a private cell." On direct examination, defense counsel asked the defendant "on April 14, 1980 when [Haymans] came to see you in jail . . . had you had an opportunity to see programs on television concerning the search for [the victim]?" In view of the numerous references in the transcript to the fact that defendant was in the Richmond County jail, we conclude that defendant has not shown he was harmed by the testimony that he had been interviewed by the FBI while in jail. Furthermore, we find that the trial court acted appropriately in instructing the jury to disregard the FBI agent's statement. The trial court acted well within its discretion in denying defendant's motion for a mistrial. *Ladson v. State,* 248 Ga. 470 (285 SE2d 508) (1981).

10. Defendant objects to the "opinions" given by four witnesses on the grounds that (a) three of the witnesses were not qualified as experts to give opinions; (b) the lay opinions were based on facts not within the province of the witnesses' knowledge and (c) the opinions

---

[17] One such reference to the defendant being in jail was made by a Henry County police officer while relating the events surrounding defendant's arrest for giving a false name.

of the medical examiner, qualified by the trial court without objection as an expert, had "no scientific basis" and were "not totally accurate."[18] However, our study of the record shows that defendant failed to object to any of these complained-of errors,[19] and thus he may not raise them for the first time on appeal. *Willis v. State,* 249 Ga. 261 (290 SE2d 87).

11. In his eleventh enumeration of error, defendant argues that the trial court erred in denying his motion to suppress the vial of Fiorinal #3 removed from the defendant during the pat-down search conducted by Henry County police officers. Defendant maintains that the search was illegal as the officers had neither a search warrant nor had they placed him under arrest at the time; therefore, the "fruit" of the search must be suppressed. However, testimony of the officers at trial was that the defendant had been placed under arrest for giving a false name prior to the search.[20]

We agree with the trial court that defendant's arrest was supported by probable cause and the search of his person incident to that arrest was lawful. United States v. Robinson, 414 U. S. 218 (94 SC 467, 38 LE2d 427) (1973); *Evans v. State,* 235 Ga. 396 (219 SE2d 725) (1975).

12. (a) Defendant argues that two state witnesses violated the rule of sequestration. Code Ann. § 38-1703. Both witnesses remained

---

[18] By selectively editing portions of the transcript quoted in his brief, defendant attempts to find support for his argument that the medical examiner was not qualified to give an expert opinion of the time of the victim's death based, in part, on the deterioration of the victim's clothing. The examiner testified that he was unable to pinpoint the exact time of death, but that his opinion was "an estimate based on [his] experience . . . the degree of decomposition of the body, the changes in the clothing and the time the individual went missing." The medical examiner testified that he had performed autopsies on over 6000 bodies about 500 of which were badly decomposed. In none of these did he find that the clothing had begun to deteriorate when the deceased had been dead for less than two months. The examiner further testified that he "usually looked" for a pure cotton fabric on the deceased, as it had been his experience that, after two months, the dye in the fabric begins to disappear and the fibers deteriorate. The medical examiner opined that based on the date the victim was last seen, the deterioration of his clothing and the decomposition of the victim's body, the victim had been dead "three or four months" when found.

[19] In his brief, defendant maintains that over his objection an FBI agent was permitted to give an "expert" opinion as to the manner in which one of the ransom notes was written. However, the record shows that the question defendant objected to was withdrawn by the state; no other objection to the witness' testimony was made.

[20] While defendant maintains that one officer could not remember whether defendant was searched prior to or after arrest, the record shows the officer testified he could not remember whether defendant had been searched prior to or following completion of the inventory of the van.

in the courtroom during the trial then testified for the State on rebuttal. "In criminal cases, the violation of the rule of sequestration by *any* witness either for the defense or for the prosecution goes to the credibility rather than to the admissibility of the witness' testimony." *Blanchard v. State,* 247 Ga. 415, 417 (276 SE2d 593) (1981). In this case the trial court instructed the jury that in considering the credibility of the rebuttal testimony of these two witnesses, they were to remember that both witnesses had been in the courtroom and had heard sworn testimony of other witnesses. We find no error.

(b) Defendant also urges that the trial court erred in refusing to strike the rebuttal testimony of Carla Hohenhouse as it failed to rebut any evidence presented by the defendant. Hohenhouse, a co-worker of the victim, testified that when she last saw the victim on January 29, he was wearing a blue corduroy sports coat, slacks and tie. This description matched the description of the clothes worn by the victim when his body was discovered at Armstrong State College. The State offered this testimony to rebut the defendant's testimony that when the victim was last seen alive on February 8, he wore a suit. Further, "[w]hether a witness may be recalled is within the trial court's discretion and will not be interfered with unless manifestly abused." *Morris v. State,* 228 Ga. 39, 50 (184 SE2d 82) (1971); *Holmes v. State,* 224 Ga. 553 (17) (163 SE2d 803) (1968). We find no abuse of discretion.

13. We agree with the trial court that there was sufficient evidence to authorize a charge under Code Ann. § 26-801,[21] parties to crime, to the jury. The State sought to prove that the crimes of extortion and murder were inextricably intertwined. Defendant maintained that others were involved in the extortion attempt; from this the State argued that, even if defendant did not act alone in committing extortion and murder, he could be liable for the crime of murder under Code Ann. § 26-801. Furthermore, Tamara Haymans testified the defendant stated to her that he "could be an accessory to murder." We find no error.

14. Last, defendant complains of three instances of alleged

---

[21] This section provides: "(a) Every person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of a crime. (b) A person is concerned in the commission of a crime only if he: (1) directly commits the crime; or (2) intentionally causes some other person to commit the crime under such circumstances that the other person is not guilty of any crime either in fact or because of legal incapacity, or (3) intentionally aids or abets the commission of the crime; or (4) intentionally advises, encourages, hires, counsels, or procures another to commit the crime."

prosecutorial misconduct. To the first two instances,[22] no objection was made and we decline to review them on appeal. *Jones v. State,* 243 Ga. 820 (2) (256 SE2d 907) (1979). Following the trial court's charge to the jury, defendant requested that the trial court instruct the jury that sympathy for the victim's family could play no role in their determination of guilt or innocence. The trial court recalled the jury and administered the requested charge. Defendant then made a general objection to the district attorney's closing argument as an attempt to elicit sympathy for the victim's family.[23] No motion for mistrial was made.

Defendant urges that the sympathetic appeal of the district attorney's argument prejudiced him to such a degree that he was unable to get a fair trial. We do not agree. Defendant's request for a charge on sympathy was granted by the trial court. No other remedy was sought. We find no cause for reversal.

*Judgment affirmed. All the Justices concur.*

DECIDED JUNE 2, 1982 —
REHEARING DENIED JUNE 22, 1982.

*G. Terry Jackson,* for appellant.

*Spencer Lawton, Jr., District Attorney, David T. Lock, Assistant District Attorney, Michael J. Bowers, Attorney General, Janice G. Hildenbrand, Staff Assistant Attorney General,* for appellee.

---

[22] The first instance involved the district attorney's statement in closing argument that Peter Hershy was "not the only person that law enforcement authorities asked to take the polygraph." As for the second instance, while questioning an FBI agent about the lack of fingerprints found on the victim's car or ransom notes, the district attorney put on a pair of rubber gloves.

[23] Defendant maintains that he objected to the district attorney's argument while in progress on this ground. However, the record shows that defendant's objection was that the district attorney should address his remarks to the jury rather than to the defendant.