**FOURTH DIVISION**
**DILLARD, C. J.,**
**DOYLE, P. J., and MERCIER, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

June 19, 2018

# In the Court of Appeals of Georgia

A18A0421. READO-SECK v. THE STATE.

DILLARD, Chief Judge.

Following a trial by jury, Cathy Marie Reado-Seck was convicted of first-degree vehicular homicide and driving under the influence to the extent she was a less-safe driver. Reado-Seck appeals from her convictions, arguing that her trial counsel rendered ineffective assistance by failing to object to improper testimony regarding a correlation between clues of impairment on the horizontal gaze nystagmus field sobriety test ("HGN test") and specific numeric blood alcohol concentration levels. For the reasons set forth *infra*, we remand this case to the trial court for further proceedings consistent with this opinion.

Viewed in the light most favorable to the jury's verdict,[1] the record shows that in the early morning hours of March 16, 2014, Reado-Seck was driving a BMW SUV on Lawrenceville Highway in DeKalb County when she approached an intersection from the opposite direction of the victim, who was operating a motorcycle. Reado-Seck attempted to slowly make a U-turn on a green signal and, as she did so, failed to yield to the oncoming victim, resulting in a low speed impact collision. The victim crashed to the ground after hitting the side of the SUV, and Reado-Seck attempted to move her car out of the road prior to checking on the victim, but she was stopped by another motorist who witnessed the accident. The victim was then transported to a hospital in critical condition, but he later perished due to an aortic laceration from the sudden impact.

Prior to the collision, the eyewitness initially observed the victim traveling behind him on the motorcycle (the headlight of which was operational), and he recalled that the victim stayed within the lane and drove about 10 miles per hour faster than he was traveling when passing the witness on the roadway before the accident occurred. This witness also testified that he initially thought the victim was intoxicated because he first saw the motorcycle leave a bar, but he later changed his

[1] *See, e.g.*, *Sowell v. State*, 327 Ga. App. 532, 534 (759 SE2d 602) (2014).

mind because nothing about the victim's driving made him believe that he was intoxicated, concerned him, or made him fear for his safety. And an investigating officer who reconstructed the accident concluded that "the motorcycle had zero contributing factors to the crash."

As for Reado-Seck, when law enforcement arrived, an investigating officer detected the odor of an alcoholic beverage on her breath. And after initially denying that she had been drinking alcohol, Reado-Seck informed the officer that she had consumed an alcoholic beverage some twelve hours prior to the accident. But Reado-Seck later changed her story, telling another officer that she had recently consumed an alcoholic beverage at a friend's house; that she was driving home, but tried to go back to her friend's house when she realized that she "couldn't make it home"; and that she did not see the victim before making the U-turn. That same officer testified that Reado-Seck appeared "upset" and "a little confused."

An officer decided to administer field-sobriety tests to Reado-Seck, during which she exhibited six out of six clues of impairment on the HGN test and had such difficulty maintaining her balance during the instructional portion of the walk-and-

turn test that she did not complete it.[2] A preliminary breath test was also positive for the presence of alcohol, and Reado-Seck's eyes appeared bloodshot and watery. Ultimately, the officer at the scene reached the conclusion, based on her training and experience, that Reado-Seck was impaired and that her impairment contributed to the collision. Shortly thereafter, Reado-Seck was placed under arrest. Reado-Seck then provided a urine sample, but refused to allow her blood to be drawn for testing. Approximately two hours after the accident, however, Reado-Seck voluntarily blew a .069 and .070 on an Intoxilyzer test.

Hearing this evidence, the jury found Reado-Seck guilty of first-degree vehicular homicide and driving under the influence to the extent she was a less-safe driver. She now appeals from these convictions, following the trial court's denial of her motion for new trial.[3]

---

[2] The officer who administered the tests testified that Reado-Seck told her that she was "too emotional" to perform the walk-and-turn test, but the officer also testified that she was "having some difficulty keeping in [the] balanced position" and "stepped out multiple times" during the instructional phase.

[3] When a criminal conviction is appealed, the appellant no longer enjoys a presumption of innocence. *See Arbegast v. State*, 332 Ga. App. 414, 415 (1) (773 SE2d 283) (2015); *Westbrooks v. State*, 309 Ga. App. 398, 399 (1) (710 SE2d 594) (2011). And the relevant question before us is whether, "after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."*Jackson v.*

4

Reado-Seck raises the argument of ineffective assistance of counsel for the first time on appeal, but the State concedes that this was her earliest practicable opportunity to do so.[4] In general, when an appeal presents the earliest practicable opportunity to raise an ineffective-assistance-of-counsel claim, we will remand the case to the trial court for an evidentiary hearing on the issue,[5] which is what Reado-Seck asks that we do. But the State also correctly notes that "[r]emand is not mandated if we can determine from the record that the defendant cannot establish ineffective assistance of counsel[.]"[6] In this regard, under the two-prong test of

_____

*Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). We do not weigh the evidence or determine witness credibility, and the jury's verdict will be upheld so long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case. *See Miller v. State*, 273 Ga. 831, 832 (546 SE2d 524) (2001); *Westbrooks*, 309 Ga. App. at 399-400 (1). Although Reado-Seck does not challenge the sufficiency of the evidence against her, we conclude that the evidence, as detailed *supra*, was sufficient to sustain her convictions. *See Jackson*, 443 U.S. at 319 (III) (B).

[4] Reado-Seck was still represented by trial counsel until after the trial court denied her motion for new trial and was only represented by new counsel upon the filing of her notice of appeal.

[5] *Ruiz v. State*, 286 Ga. 146, 149 (2) (b) (686 SE2d 253) (2009); *Grier v. State*, 262 Ga. App. 777, 781 (3) (586 SE2d 448) (2003).

[6] *Ruiz*, 286 Ga. at 149 (2) (citation omitted); *accord Grier*, 262 Ga. App. at 781 (3); *see Brown v. State*, 289 Ga. 259, 263 (4) (710 SE2d 751) (2011) ("[When] the ineffectiveness relates to alleged errors made during the course of the trial as shown

5

*Strickland v. Washington*,[7] a defendant must show that trial counsel's performance was "professionally deficient, and but for counsel's unprofessional errors, there exists a reasonable probability that the outcome of the proceeding would have been more favorable."[8]

Here, Reado-Seck takes issue with her trial counsel's failure to object to testimony by a law-enforcement officer who administered the HGN test at the scene, observed six out of six clues of impairment, and opined that, based upon her training, a person who exhibits six out of six clues would "not only have a visual impairment present, but their . . . blood/alcohol concentration would be at or above a .10."

The officer was qualified, without objection, as an expert in DUI investigations and detecting impaired drivers. She then explained how the HGN test is conducted and evaluated, including that there are six clues of impairment. She offered, in response to the State's question as to how many clues she would expect to see on an

---

by the transcript, then trial counsel's testimony may not be required; the record speaks for itself." (punctuation omitted)).

[7] 466 U.S. 668 (104 SCt 2052, 80 LE2d 674) (1984).

[8] *Ruiz*, 286 Ga. at 149 (2) (b); *see Grier*, 262 Ga. App. at 781 (3) ("To meet that two-prong test, the defendant must show that trial counsel's performance was deficient, and that the deficient performance prejudiced his defense.").

impaired driver, that, "[a]ccording to the [National Highway Transportation Safety Administration] curriculum, four out of six clues on each exam would indicate that a person is not only impaired, but their blood/alcohol concentration would be at or above a .08." The officer then described her administration of the HGN test to Reado-Seck, who exhibited six out of six clues of impairment. The State then asked the officer if exhibiting six out of six clues of impairment told her anything, to which she responded as follows:

> Yes. Based on my NHTSA training, the National Highway Transportation Safety Administration, it indicates to me that a person who exhibits six out of six clues would not only have a visual impairment present, but their BAC or blood/alcohol concentration would be at or above a .10.

The officer did not describe what her training in this regard entailed or discuss any scientific studies that support the conclusion of a correlation between the six clues of impairment and blood alcohol concentration levels. But Reado-Seck did not object to the testimony, and the officer went on to describe her attempt at the administration of the other field-sobriety tests.

Reado-Seck argues that the foregoing testimony was improper because no foundation was laid to support the officer's conclusions, as required by *Harper v.*

7

*State*.[9] In *Harper*, our Supreme Court held that a trial judge may "decide whether the procedure or technique in question has reached a scientific stage of verifiable certainty, or . . . whether the procedure 'rests upon the laws of nature.'"[10] A trial court may make this determination from evidence presented by the parties, including expert testimony.[11] The court may base its decision on exhibits, treatises, or persuasive cases from other jurisdictions.[12] In short, a trial court reaches a conclusion based on the available evidence "rather than by simply calculating the consensus in the scientific community."[13] Then, once a procedure is "recognized in a substantial number of courts, a trial judge may judicially notice, without receiving evidence, that the procedure has been established with verifiable certainty, or that it rests upon the laws of nature."[14]

---

[9] 249 Ga. 519 (292 SE2d 389) (1982).

[10] *Id.* at 525 (1).

[11] *Id.*

[12] *Id.*

[13] *Id.* at 526 (1).

[14] *Id.*

Recently, in *Spencer v. State*,[15] the Supreme Court of Georgia explained that "[i]t is generally accepted that the HGN test has reached a state of verifiable certainty in the scientific community and is admissible as a basis upon which an officer can determine that a driver was impaired by alcohol."[16] Nevertheless, the *Spencer* Court also recognized that "whether the HGN test may properly be used as evidence that a driver is impaired by alcohol *is not the same question* as whether the HGN test has been established as an indicator of either a specific number or a numeric range of blood alcohol content."[17] Thus, our Supreme Court reversed the appellant's conviction for driving under the influence (less safe) when the State presented inadmissible testimony as to a correlation between the HGN test and numeric blood-alcohol content.[18] And we, too, have reversed a conviction for driving under the

---

[15] 302 Ga. 133 (805 SE2d 886) (2017).

[16] *Id.* at 136 (punctuation omitted).

[17] *Id.* (emphasis supplied).

[18] *See id.* at 138-39 ("We conclude that the evidence presented by the State in this case was insufficient to establish the scientific validity or reliability of any correlation between a particular number of clues on an HGN test and a numeric blood alcohol content, whether a specific percentage or 'equal to or greater than' a specific percentage. The trial court therefore abused its discretion in admitting this evidence. In light of the [conflicting evidence that was presented], we cannot say that this error was harmless, and we therefore reverse [the] conviction for DUI (less safe).").

influence (less safe) when a trial court erroneously admitted evidence of a correlation between clues of impairment and blood-alcohol concentration, which we have explicitly held is relevant to a charge of DUI (less safe), when there was not other overwhelming evidence of impairment so as to render the error harmless.[19]

In light of this well-established precedent, the lack of an objection to the relevant testimony by Reado-Seck's trial counsel,[20] and the evidence presented at

---

[19] *See Bravo v. State*, 304 Ga. App. 243, 250 (2) (696 SE2d 79) (2010) ("[The defendant] was charged with DUI less safe, not DUI per se. Nevertheless, as this Court has previously concluded, evidence regarding his BAC is relevant to the DUI less safe charge. The only evidence of . . . BAC was [the] inadmissible opinion testimony that [the] BAC was 0.25, evidence that the prosecutor emphasized in his closing argument. In light of the remaining evidence of . . . impairment, combined with the testimony of defense witnesses and the fact that the jury had difficulty reaching its verdict, we conclude that it is highly probable that the erroneous admission of the evidence contributed to the verdict. Accordingly, the . . . admission of [the] testimony regarding [a] 0.25 BAC was not harmless." (footnotes omitted)); *see also Webb v. State*, 277 Ga. App. 355, 357 (1) (626 SE2d 545) (2006) (holding that numerical evidence of blood-alcohol content was relevant to proving that defendant was driving under the influence to the extent that she was a less-safe driver).

[20] *See Spencer*, 302 Ga. at 138-39 (finding that the State presented insufficient evidence to establish scientific reliability and validity of correlation between the number of clues on an HGN test and numeric blood-alcohol concentration, when officer testified that his "knowledge of the HGN test was based on his participation in police training totaling approximately two weeks, and that he had no medical, physiological, or other specialist training" and "[w]hile the officer testified, over objection, that the test was 'scientific' because his training 'has shown him that there's a correlation between the clues observed in this evaluation and blood alcohol

trial,[21] we remand this case to the trial court for an evidentiary hearing and determination in the first instance on Reado-Seck's ineffective-assistance-of-counsel claim.[22]

*Case remanded with direction. Doyle, P. J., and Mercier, J., concur.*

---

content. There's a direct connection between the two of them,' and that 'several studies' supported this, he did not identify the studies and they were not admitted into evidence" and "[n]o scientific or medical testimony was presented at trial" (punctuation omitted)).

[21] In addition to the evidence detailed *supra*, which we have viewed in the light most favorable to the jury's verdict, the jury was also presented with evidence that a law-enforcement officer found Reado-Seck's speech was normal and only a moderate smell of alcohol about her person; the weather on the night in question was wet and drizzly; Reado-Seck told an officer she had taken Nyquil, which contains an ingredient that can result in a clue of impairment on the HGN test; the victim's blood was drawn for a toxicology report, which report showed .199 and .233 blood-alcohol concentrations, respectively; Reado-Seck's friend fixed a liquor drink for Reado-Seck, but spilled it all over her purse, and Reado-Seck thereafter drank a beer instead; and Reado-Seck's friend went to the accident scene after she called her, and the friend spoke to another witness who was not interviewed by law enforcement but who the friend identified in a dashcam video taken at the scene, and which witness indicated to the friend that the victim on the motorcycle had been speeding.

[22] *See Beaver v. State*, 308 Ga. App. 380, 383 (3) (707 SE2d 590) (2011) ("Because this appeal is the earliest practicable opportunity for new appellate counsel to raise an ineffectiveness claim, we remand the case to the trial court for a hearing on that claim."); *In the Interest of D. C.*, 307 Ga. App. 542, 543 (705 SE2d 313) (2011) (remanding for evidentiary hearing on ineffective-assistance-of-counsel claims raised for the first time on appeal when the question could not be adequately addressed as a matter of law on the existing record).