## 74347. FUQUA v. THE STATE.
### (359 SE2d 165)

BIRDSONG, Chief Judge.

The appellant, Edwin Fuqua, a former police officer, appeals his conviction for obstruction of an officer and possession with intent to distribute and distribution of cocaine. Joe Canning, a witness for the defense, testified that he had known Fuqua since both of them had been in the fifth grade. Fuqua introduced him to cocaine and he purchased cocaine for his use from Fuqua. In 1984 Canning contacted the Clarke County police and advised them of his drug addiction and that he purchased the cocaine from Fuqua. The county officials thought such an investigation could better be handled by the Georgia Bureau of Investigation and took Canning to them. During the following year, Canning made approximately five attempts, under the auspices of the GBI and the FBI to induce Fuqua to sell him cocaine, without success. In 1985 Canning was arrested for possession of cocaine and was placed in jail. While in jail, he was interviewed by the officer he had contacted one year before regarding his purchase of cocaine from Fuqua. Canning said, the police knew that "Edwin [Fuqua] was a cocaine addict. . . . I just confirmed it." The officer enlisted his assistance in making a purchase of cocaine from Fuqua. Because Canning had worked with the GBI and the FBI during the past year, they were brought into the plan. Two adjoining rooms were rented in a local motel. The officers procured Canning's release from jail through a judge and let him place a phone call to Fuqua. Canning invited Fuqua to the motel. When Fuqua arrived, he was smoking a "marijuana . . . joint." Canning told Fuqua he "wanted to party," but Fuqua was thinking of beer, so Canning "made a gesture . . . (sniff, sniff) . . . [and] Edwin's reaction . . . he was certainly ready to go at that point. . . ." Fuqua started making phone calls and found a supplier for "two halves" — half ounces. Canning gave Fuqua the money to purchase the cocaine. Fuqua left and was followed by an officer in an unmarked police car and was under surveillance by a plane in the air. Both surveillance missions failed. Fuqua finally returned to Canning's room at the motel, and the officers heard what they thought to be Canning and Fuqua "sniffing" the cocaine. Canning testified that both he and Fuqua sniffed a "line" of cocaine.

Lt. Lucas, one of the monitoring police officers, determined that they had sufficient evidence and left the motel room to gather together the other officers for the arrest. While the officers were assembling in front of Canning's motel room, Fuqua walked out of the room

into their midst. All parties were surprised. Lt. Lucas drew his weapon and heard another officer say: "Police, Ed. Halt." Lucas said Fuqua was "kind of bewildered, looking around . . . he started doing some sort of gyrations . . . throw[ing] his arms around . . . saying what is going on here." Fuqua started to walk away and Lucas attempted to apprehend him. When Fuqua attempted to pull away from Lucas' grasp, Lucas' weapon discharged. The firing of the weapon was accidental and the bullet struck no one, but Fuqua sustained a powder burn on his neck.

Lucas had seen Fuqua place a packet of cocaine up his sweater sleeve while he was in Canning's room and he was observing Fuqua closely while they were in the parking lot. "I had assumed that he was going to try to just dump it. . . . When Detective Duncan and Allbritten were about to apprehend him . . . I saw his right hand go like this and I saw the small package hit the ground." Fuqua placed his foot over the small glassine packet, but after he was apprehended Lucas picked it up and turned it over to the FBI. Another officer also found another packet where the scuffle occurred. Both packets were determined to contain cocaine.

At trial, the defendant asserted the defense of entrapment. The jury returned a verdict of guilty on both counts and this appeal followed. *Held*:

1. Appellant contends the State is guilty of "prosecutorial misconduct" during the trial: in violation of appellant's "right to due process." It is argued that the prosecutor made "several specific errors of law . . . which standing alone constitute reversible error. When considered together, however, these errors constitute an intentional pattern of prosecutorial misconduct. . . ." The so-called "pattern of prosecutorial misconduct" is broken down into three types of error: (a) appellant was not provided with a supplemental statement made by a police officer in compliance with his *Brady* motion, (b) although the prosecutor professed to have an "open file" policy and turned over his entire file to the defense, some of the witnesses' testimony was not contained in their statements in the file, and (c) the prosecutor improperly placed appellant's character in evidence by introducing "testimony that the appellant had been co-indicted on the wiretap charge with Carole Gillen."

(a) The appellant presented a *Brady* motion to the court prior to trial and the assistant district attorney turned over his entire file to the defense. Five days prior to trial, the prosecutor discovered appellant had made a statement to Officer Hammond while being transported to jail and jotted down a summary of the officer's testimony. That summary was provided to defense counsel on the day of trial. The first day of trial was May 28, 1985. Officer Hammond was called to testify on June 3, 1985. The State did not attempt to introduce the

statement nor did it call as a witness the officer who heard the statement. Appellant's counsel moved for a mistrial on the ground that the officer's testimony was "exculpatory" and had not been provided to him until the day of the trial. In the alternative, appellant's counsel asked the court "to compel that person to come into court. I don't have time to subpoena him now." The prosecutor advised the court, "in all fairness I am not at all sure how accurate what I wrote down that morning in a hurry is exactly what Sgt. Hammond testified to." The court adopted appellant's counsel's alternative solution and required production of the witness in court. Appellant's counsel had expected Officer Hammond to testify in the manner in which the prosecutor had summarized his statement, i.e., Fuqua told him "he knew he was being set up but didn't have enough sense to get out, and that he had been pretty messed up on cocaine before, but wasn't doing much now." Instead, Officer Hammond testified that Fuqua said: "tell [Lt.] Gene Lucas to get rid of the cocaine that they found. It wasn't his. And I told him that I didn't think Gene would do that, but I would give him the message anyway. He said it is not mine. I told him, I said: 'Come on, Ed. You are talking to Rick now, somebody that has known you all these years, not some Federal agent. I know you have had a problem.' He said: 'Well, yeah. Off the record I have had a problem with cocaine in the past; but I think I have got it squared away. . . .' He said he was set up . . . and I don't remember the exact conversation."

Appellant's counsel argues this "situation was created, perhaps even orchestrated" by the prosecutor providing him with his file with "inaccurate *Brady* material. . . ." This allegation of error will be discussed in conjunction with appellant's claim of another *Brady* error.

(b) Appellant's counsel also called the informer as a witness and Canning testified that he had contacted the Clarke County police after he became addicted to cocaine and had spent $20,000 to $25,000 for cocaine over the past two years. The majority of his direct testimony dealt with his cooperation with the GBI and FBI in attempting to make a purchase of cocaine from the appellant during the past year. His conversations with appellant had been taped and he had been wired with a radio transmitter during some of his talks with Fuqua. Those tape recordings were identified and played for the jury. On cross-examination, Canning testified that Fuqua "first introduced [him] to cocaine." Appellant also taught him to use a syringe, and because of Fuqua providing him with cocaine, he became addicted. He was asked if Fuqua had provided him with 95 percent of the cocaine he had purchased over the past two years, and responded: "Yes." He had observed Fuqua use marijuana and cocaine in his home, and as late as three weeks before this latest arrest he was discussing with Fuqua the purity of the cocaine they were using. Prior to

the purchase of cocaine at the motel, Fuqua was calling people to purchase cocaine, and he knew all the telephone numbers. He did not have to consult anything for a number. He had seen Fuqua sell cocaine "to other people" and "to at least one underage person. . . ." Canning also repeated several times, that "this occasion [at the motel] was no different from what had happened before" by him providing the money and Fuqua obtaining the cocaine. Appellant's counsel argues that the "inflammatory and prejudicial nature of these comments is obvious," but he had not been supplied with this information "despite the State's previous representations of complete, open file discovery."

Appellant also complains about the supplemental statement filed by the police officer that he had seen the appellant "lunge" at the confiscated cocaine with his mouth. In argument to the court, counsel admitted that the assistant district attorney had told him that this was the first time he had seen the supplemental statement and there was no question he "did not conceal that report. . . ." However, he argues, "an agent of the State did conceal that report from me by failing to provide it to [the district attorney] to be provided to me."

"There is no constitutional right to discovery in a criminal case, and *Brady* [*v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215)] did not create one. . . ." *Weatherford v. Bursey*, 429 U. S. 545, 559 (97 SC 837, 51 LE2d 30). " '*Brady* applies to "the discovery, after trial, of information which had been known to the prosecution but unknown to the defense." ' " *Cunningham v. State*, 248 Ga. 558, 561 (284 SE2d 390). Furthermore, a defendant's own statements to police are not unknown to defendant and are not subject to discovery under *Brady.* Id.; accord *McCarty v. State*, 249 Ga. 618, 620 (292 SE2d 700). *Brady* does not require *pre-trial* disclosure of exculpatory material, and is not violated when such material is made available to defendants *during the trial. Castell v. State*, 250 Ga. 776, 781 (301 SE2d 234). *Brady* does cover "suppression by the prosecution of evidence favorable to any accused upon request . . . where the evidence is material either to guilt or to punishment. . . ." 373 U. S. at 87. In the instant case there was no evidence of suppression or of misrepresentation. *Reed v. State*, 249 Ga. 52, 56 (287 SE2d 205); see also *Weatherford*, supra at 560. It is elementary that counsel for the State can make available only such evidence as it has in its file, or of which it has knowledge, and "is under no requirement to conduct an investigation on behalf of a defendant. . . ." *Dalton v. State*, 251 Ga. 641 (1) (308 SE2d 835). Nor is an accused, as a matter of right, entitled to receive copies of police reports and investigations made in the course of preparation of a case against a suspect. *Nations v. State*, 234 Ga. 709 (1) (217 SE2d 287). Further, our Supreme Court and the U. S. Supreme Court are in agreement that "there is 'no constitutional re-

quirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case.' " *Harper v. State*, 249 Ga. 519, 528 (292 SE2d 389); accord *Moore v. Illinois*, 408 U. S. 786, 795 (92 SC 2562, 33 LE2d 706). It is clear beyond cavil that no counsel can guarantee opposing counsel that statements of witnesses, furnished in good faith, will include every iota of information each witness possesses, and that the witnesses will not decline to reaffirm what is included in the statement, nor that such witnesses will never add information to that recorded. What is evident from the record is that counsel who records a witness' statement is not the only counsel that is subject to surprise. Appellant's counsel was forewarned that the summation of testimony might not be accurate but chose to call that witness as his own. This was a conscious election.

Hence, counsel was forewarned as to the accuracy of a summation of one witness' testimony, and was not warranted in concluding that another witness' statement included all of the information possessed by that witness, nor was he authorized, as a matter of law, to conclude that an informant might not possess information adverse to his client which was not included in a statement made to the police which was included in the prosecution's file made available to him. Counsel is a victim of his own trial tactics, not the tactics of the prosecution. The risk he assumed cannot be attributed to the State on a silent record. There is no evidence of suppression or misrepresentation.

(c) Appellant contends his character was improperly placed in issue by the prosecutor when he elicited "the fact that the appellant was also arrested on federal wiretap charges." The pages referenced in the record by appellant to support this allegation show only that a member of the Clarke County Police Department stated: "I was out there [at the motel] to assist in the execution of the arrest warrant." Appellant's counsel promptly moved for a mistrial on the ground "[t]he officer just stated that the FBI had an arrest warrant for Mr. Fuqua which puts his character in evidence. . . . There is an FBI warrant pending he said." Counsel embellished what the witness stated at the trial. But, at a later point, the witness was asked about the "scuffle" between Fuqua and Lt. Lucas at the motel, and responded: "Mr. Fuqua had a beer bottle in his right hand and made an erratic motion and asked: 'What are you arresting me for?' He [Lt. Lucas] was telling him that he was under arrest, and that we had a Federal warrant for his arrest." A second motion for mistrial was denied at this point. Counsel contends that because the State placed in evidence the existence of a federal warrant, he had to cross-examine a State witness to show the jury "the dismissal of the federal indictment." Prior to that point in the trial, appellant's counsel asked the witness the nature of the information the police possessed about Fu-

qua's involvement in drugs, prior to Canning contacting them. The witness could not recall any prior information but because Fuqua was a former police officer they turned Canning over to the GBI. Appellant's counsel asked the witness if he knew that Fuqua "might have some . . . knowledge about electronic surveillance. . . . Working for lawyers around town on divorce cases and that kind of stuff?" The witness said they did and because of Fuqua's background they contacted the FBI. Canning had told them "something about wire tapping which was above our heads. . . . Q. . . . with respect to the drugs what do you recall Mr. Canning saying? A. He related the same thing and talked about some other individuals, Carole Gillen. . . . Q. He thought they might be involved with Ed in drug traffic? A. Yes. Q. Do you recall anything else about that conversation. . . . A. He said he had contact with Ed and he had bought drugs from Carole Gillen. . . . Q. Not that Fuqua had bought drugs from Carole Gillen. A. I don't remember him saying that. He said that he had worked with her. Q. That he had worked with Carole Gillen, that Joe Canning had? A. He related out there at the GBI office that Carole Gillen and Ed Fuqua and he had done some wiretapping." Appellant's counsel then brought out the fact that the wiretapping was why the FBI became involved, and that Fuqua and Carole Gillen had been indicted on wiretapping charges and Gillen had entered a plea of guilty, but the indictment was then dismissed because of an imperfection in the manner in which it was charged.

In appellant's brief, he contends that although he brought out the fact of Carole Gillen's involvement with Fuqua and the wiretapping indictment, he was required to enter this area because of the State witness' reference to a "warrant."

We find no reversible error in the manner in which the trial court resolved this issue. The State's witness did refer to a "warrant" as the reason for participating in the motel stake-out. However, the witness only referred to a "federal warrant" when a police officer was responding to Fuqua's query at his arrest. The references to the "warrant" and the "Federal warrant" were part of the res gestae and the circumstances surrounding the accused's arrest. Surrounding circumstances constituting part of the res gestae may always be shown to the jury along with the principal fact, and their admissibility is within the discretion of the trial court. *Andrews v. State*, 249 Ga. 223 (290 SE2d 71). Hence, acts and circumstances forming a part or continuation of the main transaction are admissible as res gestae and it does not matter that the act is another criminal offense and does not tend to establish the main offense. *Parker v. State*, 162 Ga. App. 271, 272 (290 SE2d 518). In addition, all circumstances surrounding an arrest are admissible for whatever value the jury desires to place on them. *Bixby v. State*, 234 Ga. 812, 813 (218 SE2d 609); *State v. Luke*, 232 Ga. 815,

816 (209 SE2d 165).

2. Turning to appellant's contention that when these alleged errors are "considered together . . . [they] constitute an intentional pattern of prosecutorial misconduct . . . ," we must first observe that this court and the Supreme Court have held that " '[a]ny error shown upon the record must stand or fall on its own merits and is not aided by the accumulative effect of other claims of error.' " *Haas v. State*, 146 Ga. App. 729 (8) (247 SE2d 507), U. S. cert. den. 440 U. S. 922; accord *Hess Oil &c. Corp. v. Nash*, 226 Ga. 706, 709 (177 SE2d 70); *Gilstrap v. State*, 162 Ga. App. 841, 848 (292 SE2d 495). However in *Shaw v. State*, 241 Ga. 308, 312 (245 SE2d 262), the court held "if the cumulative effect of improper prosecution tactics was to deny appellant a fair trial, the conviction cannot stand." We have found no evidence of improper prosecution tactics and appellant's conclusive characterization of them as "prosecutorial misconduct" is without foundation in fact or law. See generally *Fugitt v. State*, 251 Ga. 451 (2) (307 SE2d 471); *Mincey v. State*, 251 Ga. 255 (16) (304 SE2d 882); *Studyvent v. State*, 153 Ga. App. 161 (264 SE2d 695).

3. Appellant's last enumeration of error claims the trial court "improperly shifted the burden of proof to the appellant in its charge. . . ." In his brief, appellant states that he raised the issue of entrapment and the State was obligated to prove beyond a reasonable doubt that the defendant was not entrapped, but that twice during its charge the court "stated that the *only* issue for the jury to determine was whether the appellant knowingly committed the unlawful act charged," and in defining "admission" charged it was a statement by a defendant "which tend . . . to prove the guilt of the accused . . . or to disprove some defense set up by an accused."

The trial court charged fully and accurately on the defense of entrapment, including the nature of the defense, and that "the State has the burden of proving beyond a reasonable doubt that the Defendant was not entrapped into effecting an unlawful sale of cocaine." Appellant's counsel has cited portions of the charge relating to other matters. This enumeration is totally without merit.

*Judgment affirmed. Deen, P. J., and Pope, J., concur.*

DECIDED JUNE 9, 1987 —
REHEARING DENIED JUNE 23, 1987 —

*J. Hue Henry, Martha M. Pearson*, for appellant.
*Harry N. Gordon, District Attorney, Gerald W. Brown, Assistant District Attorney*, for appellee.