## 77232. MASSENGALE v. THE STATE.
### (377 SE2d 882)

BIRDSONG, Judge.

Appellant, James Roy Massengale, Jr., appeals his conviction of voluntary manslaughter and sentence.

In the early morning of September 12, 1987, appellant's father, James Massengale, Sr., called the Dade County Sheriff's Office and reported a homicide on his property. Deputy James White was dispatched to the scene. Deputy White went to the home of James Massengale, Sr., and knocked on the door. James Massengale, Sr., answered the door and admitted Deputy White into his home. Mr. Massengale introduced his son, the appellant, to Officer White, and stated that appellant "had shot someone down in the woods and believe[d] him to be dead." Deputy White asked where the weapon was located, and the appellant said "in here" and went into his bedroom. Appellant returned with the shotgun, which he handed to Deputy White. Appellant then took Deputy White to the crime scene, an area used for camping.

Deputy White found the victim, Tony Troxel, dead and wedged between some rocks. The victim's head had been pushed into the sleeve of a jacket, and the garment was tightly wrapped around the head.

GBI Investigator, John Wakefield, recovered one expended shotgun shell from a spider web at the scene, and found two metal shell ends and a hatchet head in a campfire. Laboratory analysis revealed that the intact expended shotgun shell and one of the burned shells were fired from the shotgun. One burned shell could not be analyzed. The shotgun was a .12 gauge shotgun with a "folded stock," the type of weapon generally used in a law enforcement field.

The victim had been shot four times. Each shot had been fired into the body at an upward angle. The wounds were such that the victim could have been standing straight up and the shooter standing at a lower level. One wound was to the front of the victim; it started to the right of the pubic rim and moved upwards lacerating the abdominal wall. The nature of this wound suggested that the victim could have been laying on his back at the time he received it. Two of the wounds entered the back; one near the lower right side of the back and the other near the upper left side of the back. The fourth and last shot fired entered the victim's mouth upward into the cranial cavity.

Russell Bolen testified that the appellant admitted to him that he had killed the victim, but claimed that he shot in self-defense. Bolen testified that appellant and Troxel had been friends. Appellant told Bolen that Troxel had told him his uncle had loaned Troxel some credit cards and that the two men had gone to Chattanooga to

shop. Appellant said the two men had separated, but about 30 minutes later he was rapidly approached by Troxtel who said they must leave immediately. Troxtel later told appellant that the credit cards had been stolen and that he had almost been caught using them. Subsequently, Troxtel camped out in hiding on the property of appellant's father. Appellant visited Troxtel at the campsite. Troxtel said he could go to jail for 20 years for taking the credit cards across a state line. The appellant stated, he told Troxtel that if questioned by the police, he would tell them he had nothing to do with the credit cards and that it was just Troxtel. Troxtel replied that he would "fix it where you can't," and attacked appellant with a hatchet. Appellant had to shoot Troxtel, who fell back with his intestines on the ground. Troxtel was shaking his arms and screaming. Appellant wanted to stop Troxtel's pain so he shot him "two more times." Appellant said that during the shooting Troxtel dropped the hatchet in the fire. Appellant later told his parents that he had put the shotgun shells into the fire. However, appellant later remembered and told Bolen that he had shot Troxtel four times. On cross-examination, Bolen admitted that he had earlier testified that appellant had told him that all of the shots were fired real fast.

Appellant testified that only Troxtel used the credit cards, once to buy dinner for appellant and a man named Kevin and again when they went to J. C. Penney's at Northgate Mall. Appellant denied using the cards himself. The appellant recounted the incident at J. C. Penney's and stated that a couple of days later, Troxtel, who had no other place to stay, borrowed his camping equipment. Troxtel carried the camping gear and a hatchet. Appellant, at Troxtel's request, brought along his shotgun as a protection against snakes. At the campsite the two men talked. Troxtel said he could get 20 years for taking the cards across a state line. Appellant testified he told Troxtel that he did not want to get mixed-up in anything like that, and that if asked by the police, he would tell them what happened. Troxtel stated that he would make sure that the appellant did not say anything, and attacked appellant with the hatchet. Appellant "moved to the side and shot at the same time, and [he] kept shooting." The first shot straightened Troxtel up and kind of turned him. Appellant was not sure exactly how the shots hit Troxtel, but one shot struck and caused him to flip backward off the rock he was on. Appellant could hear Troxtel screaming but could not see him. All the shots were fired in a five or six second time span. Appellant blacked-out and fell on his back. When he awoke, appellant saw the shells and could only think about cleaning up the area. He picked up the shells near him and threw them in the fire. Appellant was in a sitting position when the attack began. Appellant testified that he did not want to or mean to kill Troxtel; he was acting in self-defense. Prior to this time he was

good friends with Troxtel. Appellant does not know how or when Troxtel was shot in the mouth. He did not turn Troxtel over and shoot him either in the back or in the mouth. Appellant also denied putting Troxtel's head into the sleeve of his jacket; and he testified that he did not know how the hatchet got into the fire. *Held*:

1. Appellant asserts the general grounds and the trial court's failure to grant his motion for a directed verdict as error. We disagree. Only where there is no evidence to support a verdict to the contrary is a directed verdict of acquittal authorized. *Bradley v. State*, 180 Ga. App. 386 (2) (349 SE2d 263). "[A] motion for directed verdict in a criminal trial should only be granted where there is no conflict in the evidence and the evidence demands a verdict of acquittal as a matter of law." *Taylor v. State*, 252 Ga. 125 (1) (312 SE2d 311). Reviewing the evidence in the light most favorable to the verdict, *Adams v. State*, 255 Ga. 356 (1) (338 SE2d 860), we conclude that the jury could rationally have found that it excluded every reasonable hypothesis except that of appellant's guilt, *Smith v. State*, 257 Ga. 381 (359 SE2d 662), and that any rational trier of fact could have found the appellant guilty of voluntary manslaughter beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560).

2. Appellant asserts that the trial court erred in charging the jury that the requisite scienter for voluntary manslaughter could be established by a mere showing of criminal negligence. In charging the jury, the trial court employed the language of OCGA § 16-2-1. Reviewing the charges in their entirety, we find that the trial court did not err. See *Smith v. State*, 238 Ga. 146 (2) (231 SE2d 757); *Harper v. State*, 182 Ga. App. 760 (7) (357 SE2d 117).

3. Appellant asserts that the trial court erred in overruling the motion to suppress physical evidence, specifically the shotgun. There was no error. No search occurred in this instance. James Massengale, Sr., had summoned the police voluntarily to his home, and he admitted Deputy White therein. After being told appellant had shot someone, Deputy White asked where the weapon was located, under the circumstances, a reasonable preliminary question solely to insure his safety. Compare *State v. Overby*, 249 Ga. 341 (290 SE2d 464). Appellant voluntarily left the room and returned with the weapon in plain view which he gave to the deputy. " ' "A police officer may seize what is in plain sight if, as here, [he] is in a place where [he] is constitutionally entitled to be. [Cits.] And where such a plain-view seizure takes place, there is in effect no search at all." ' " *May v. State*, 181 Ga. App. 228 (1) (351 SE2d 649). Moreover, at the time of the seizure, Deputy White "had probable cause" to suspect that the shotgun was connected with criminal activity, *Illinois v. Andreas*, 463 U. S. 765, 771 (103 SC 3319, 77 LE2d 1003), and thus under these circumstances was *"presumptively reasonable,"* *Texas v. Brown*, 460 U. S. 730, 741-

742 (103 SC 1535, 75 LE2d 502) (plurality opinion).

Moreover, assuming that error occurred in denying the suppression motion, we are convinced that in view of appellant's judicial admission of shooting the victim with a shotgun with his steadfast reliance on self-defense, any error would be harmless beyond a reasonable doubt. *Moody v. State*, 244 Ga. 247 (6) (260 SE2d 11).

4. Appellant asserts that certain information which should have been disclosed to him was not disclosed by the State. Linda Ingle testified as the State's rebuttal witness that appellant had used a credit card at Eastgate Mall to purchase some men's shoes and signed the name Kevin LeFever, and that subsequently the appellant attempted to obtain a cash refund for one of the pair of shoes. Appellant previously had testified that Steak & Ale and Northgate Mall were the only two places where he knew that the credit cards were passed. He also had testified that he and the victim only went to the J. C. Penney's store in Northgate Mall. The appellant also testified in surrebuttal, denying that he was involved in the incident testified to by Ms. Ingle.

Subsequently, appellant placed on the record that he had asked the State if it possessed "any *Brady* material which might contradict their rebuttal testimony." In essence, this constituted a general *Brady* request for "anything exculpatory." See *Tribble v. State*, 248 Ga. 274 (1) (280 SE2d 352). The State denied being in possession of any such information. Previously, the appellant in an omnibus motion filed another type of general *Brady* motion, see generally *Brady v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215), and the trial court had conducted an in camera inspection of the district attorney's case file. A sealed record was made of all information contained in that file that was not released to appellant.

Appellant asserts that in closing argument the State attempted to portray appellant as the lone culprit in the credit card venture, thereby undermining appellant's affirmative defense, notwithstanding its possession of undisclosed information which would rebut this theory. At the hearing on appellant's motion for new trial, Rex Blevins testified that he was the victim's probation officer. Several days prior to the victim's death, Blevins contacted the Dade County Sheriff's Office and was informed that the victim was being sought for questioning regarding some "credit cards violations." The defense apparently was informed of this information before trial. Investigator Don Hicks of the Dade County Sheriff's Office testified that before trial he informed appellant's attorney that there currently was insufficient information to charge anyone with the theft of the credit cards. Hicks also testified that before Troxtel's death, he was contacted by a Chattanooga detective who requested photographs of Troxtel, the photographs were mailed, and subsequently Hicks was informed that "wit-

nesses" had identified Troxtel as using the card in a business in Chattanooga. Appellant's attorney was not informed of this information by the sheriff's office. However, the record at most reveals a negligent failure to make a voluntary full disclosure of this information to the defense.

Our review of the sealed case file of the district attorney's office, pertaining to this case, reveals that the above information is not included in any of the undisclosed portions thereof. Further, appellant has made no sufficient showing that the district attorney's office was *actually* aware of this information at trial time, or that the probation officer or sheriff's office wilfully and intentionally concealed this particular information from the defense.

At the onset, we observe "that counsel for the State can make available only such evidence as it has in its file, or of which it has knowledge, and 'is under no requirement to conduct an investigation on behalf of a defendant. . . .' [Cit.] Nor is an accused, as a matter of right, entitled to receive copies of police reports and investigations made in the course of preparation of a case against a suspect. [Cit.] Further, . . . 'there is "no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case." ' " *Fuqua v. State*, 183 Ga. App. 414, 417-418 (359 SE2d 165). Certainly, a prosecutor has no obligation to contact local law enforcement and judicial agencies on behalf of the defense to uncover any information which might be remotely relevant. See *Keller v. State*, 253 Ga. 512 (2) (322 SE2d 243).

" 'There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one. . . .' [Cit.] *Brady* cannot be read as requiring that 'as a matter of constitutional law *everything* must be disclosed which might influence a jury.' " (Emphasis supplied.) *Castell v. State*, 250 Ga. 776, 782 (301 SE2d 234).

In the absence of a clear showing that this information was wilfully and intentionally concealed from the defense, we are inclined *not to impute* to the prosecutor knowledge possessed by the local police and probation authorities. Compare *Castell v. State*, supra at 782, n. 6 with *Freeman v. State of Ga.*, 599 F2d 65, 69 (5th Cir. 1979). However, pretermitting this question is the question whether disclosure of any previously nondisclosed information actually possessed by the probation officer and sheriff's office would have given rise to a reasonable doubt that did not otherwise exist. See *Castell v. State*, supra at 782. In this regard, "a prosecutor's nondisclosure of evidence may impair a defendant's right to a fair trial only if the evidence not disclosed is material in the sense that it might create in the minds of the jurors a reasonable doubt that did not otherwise exist." *Rogers v. State*, 257 Ga. 590 (3) (361 SE2d 814). The proper test for determining materiality when the prosecutor has failed "to disclose favorable

evidence pursuant to no request, a general request, or a specific request for evidence by the accused" is that " '[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.' " Id. at 592.

We find that this nondisclosed information was not material in the sense that there was a reasonable probability that its disclosure could have caused a different outcome in this trial.

*Judgment affirmed. Banke, P. J., and Beasley, J., concur.*

DECIDED JANUARY 5, 1989 —
REHEARING DENIED JANUARY 23, 1989 — ▮▮▮▮▮▮▮▮

*Herbert E. Franklin, Jr.*, for appellant.
*David L. Lomenick, Jr., District Attorney, David J. Dunn, Assistant District Attorney*, for appellee.