## A91A0904. ROLADER v. THE STATE.
(413 SE2d 752)

Judge Arnold Shulman.

The appellant was charged with one count of aggravated sodomy, one count of aggravated child molestation, and two counts of simple child molestation, all involving his then four-and-one-half-year-old daughter. A jury found him guilty on all four counts, but the trial court thereafter nolle prossed the aggravated sodomy count, based apparently on a determination that it was predicated on the same conduct as the aggravated child molestation count. The appellant's primary contention on appeal is that his constitutional right to confront the witnesses against him was violated by the introduction of

certain statements made by his daughter during the course of two videotaped interviews conducted prior to trial. The child did not testify at trial, although there appears to be no question that she was available to do so.

According to the indictment, the offenses were committed on or about December 24, 1989. The appellant testified that he got off work at about 3:15 p.m. on that date and spent the remainder of the afternoon moving his belongings from a guest house behind his parents' residence, where he had been living, to another house located about two miles away, which he had just recently purchased. The appellant's daughter and three-year-old son lived with their mother, the appellant's ex-wife; and that evening the mother brought them to the appellant's parents' home to spend Christmas Eve night. After dinner, the children expressed a desire to go with the appellant to his new house, and accompanied by George Waters, a family friend who lived with the appellant's parents, he drove them there. The four spent several hours at the appellant's new house playing together and watching television, following which they returned to the appellant's parents' house, where the appellant's son and Mr. Waters spent the remainder of the night. The appellant and his daughter, however, went back to his house to spend the night.

The following morning, the appellant returned to his parents' house with his daughter to celebrate Christmas. Various family friends and relatives were present there during the course of the day, and by all accounts the child's behavior, including her interaction with her father, seemed entirely normal and carefree. The mother returned for the two children that afternoon, stayed for a brief period of time exchanging gifts, and then took the children to the home of her father's mother (i.e., the children's great grandmother), Elizabeth Braswell. The mother testified that the daughter called to her while using the bathroom at the Braswell home and complained that it hurt her to urinate. She testified that she asked the child if she had "been drinking a lot of Coca-colas" during the day and that the child responded, "No, Mama . . . Daddy put his finger down here and it hurts me when I pee." Mrs. Braswell either overheard this statement or heard the child make a similar statement, and she telephoned the mother's father and his wife to inform them of it and to insist that the matter be reported to the authorities.

The next day, the mother's father's wife, Marie Braswell, called the Atlanta police to report the incident; and later that day she and the mother took the child to Atlanta police headquarters, where they discussed the incident with Detective Battle. He, in turn, sent them to a hospital to have the child examined by a physician. The physician, Dr. Gilcrest, testified that he asked the child "if anybody had been playing with her in her private parts," and that she responded

by saying "something to the effect that . . . some one had been putting their finger down there." He stated that she subsequently identified her father as the person who had been doing this. He testified that he did not observe any "tearing" or "gapping" of the child's vaginal area during his examination but did observe that the labia of her vagina were "very red." He stated that this condition could have been caused by the use of a bubble bath or harsh soaps or by contact with sand and dirt but that it was also consistent with the child's statement that her father had placed his finger in her vagina. The mother testified at trial that she bathed the child every night and had not observed any vaginal irritation prior to the incident in question.

About a week after the child was examined by Dr. Gilcrest, a female police investigator specializing in child sexual abuse cases conducted a videotaped interview with her at the Atlanta Police Station. Also present during this interview were Detective Battle and a "court advocate" from the "Victim Witness Program." After being reminded of a talk she and the investigator had just had "about some things that happened at Christmas," the child recalled having gone to her father's house with her little brother on Christmas Day, and, pointing to her genital area, she then stated: "Daddy put his finger down back here." Asked if this was the first time her daddy had ever done this, she nodded her head in the affirmative. However, she then gave the same response upon being asked if her father had ever done this to her before. The child recalled that as her father was driving her to his house on the occasion in question, a policeman and policewoman had followed them. She said that she told the policeman what her father had done and "hurried and tried to get to the door before he (her father) gets me," and she added that her little brother was with her at the time and tried to help her by holding her hand and making her run fast. Asked why she had run from her father, she replied: "Because he want to get me and put that thing back down here." Asked what "thing" she was referring to, she answered, "A dick."

Around the time this interview took place, that is, about a week after Christmas, the appellant was summoned to the police station to discuss the allegations against him, and he denied any wrongdoing. It appears that he was given some sort of "ticket" at this time requiring his appearance in the Municipal Court of Atlanta. At a hearing which took place in that court on February 2, 1990, Detective Battle recommended that the child and both parents be required to participate in counseling.

The child was interviewed in late February by Lisa Wise, a social worker employed by a private, non-profit organization in DeKalb County known as the Georgia Center for Children, Inc. Ms. Wise described herself as a child therapist specializing in child abuse and testified that the mission of the Georgia Center for Children was to as-

sist the police in their investigation of child sexual abuse, to help prepare children for court testimony, and to provide free psychotherapy to sexually abused children and their families. On cross-examination, she stated that she had interviewed hundreds of children who had complained of being sexually abused and that in her opinion all of them had been telling the truth.

Ms. Wise testified that she concentrated during her initial sessions with the child on getting to know her and "[j]ust gathering . . . information in my office so she'd feel comfortable and trust me." She recalled that during a session which occurred on March 29, 1990, the child spontaneously took a pair of anatomically correct male and female dolls from a table, removed their clothes, and laid the male doll on top of the female doll. She testified that she did not question the child "at a great extent" about this at the time because she wanted her "to go at her own pace." The following week, however, she conducted a videotaped interview with the child in which she questioned her in detail about the incident. The following are selected excerpts from a transcript of that interview:

"Q. Would you tell me with the dolls what you showed me before in my office about what happened to you about what you told your mom; would you do that today? A. (Nods head affirmatively). Q. Okay. Who hurt you? A. Daddy. . . . Q. Would you show me with the dolls and tell me about what happened? A. (Nods head affirmatively.) . . . Q. What do you call that part of the man's body? A. Dick. . . . Q. Will you tell me what happened? A. He put this in here, in her mouth. Q. In whose mouth? A. (Indicating.) Q. In your mouth? A. (Nods head affirmatively.) Q. Where were you? A. At (his) house. . . . Q. What room were you in? A. In his room. He put it in there (indicating). Q. And then what happened? Did he put it anywhere else? A. In his butt. Q. In whose butt? A. Mine. Q. What did it feel like? . . . A. Like dick. . . . Q. Okay. Was it hard or was it soft? A. Hard. Q. Did (the appellant) say anything to you? A. (Nods head affirmatively.) Q. What did he say? A. Told me don't tell . . . Mama. . . . Q. Where was Mommy? A. At work. Q. Where was (your brother)? A. At school — with me. . . . Q. In (the appellant's) bedroom? A. (Nods head affirmatively.) Q. Did (the appellant) ask you to touch any part of his body? A. (Shakes head negatively) . . . Q. Okay. Did he touch you in any other room of the house? A. (Nods head affirmatively.) Q. Which other room? A. My room. . . . Q. Was it daytime or nighttime? A. Nighttime. Q. Nighttime. Was it dark outside or light outside? A. Light outside. Q. It was light outside? A. Then he did it again. Q. When? A. For a day. Q. Where was Mommy? A. At work again. . . . Q. [D]id it hurt? A. Yeah. Q. It did. What did you tell (the appellant)? A. Stop. Q. And what did he say? A. He said no. Q. And then what happened? What did Mommy say when you told Mommy?

A. She told me to tell him stop. . . . Q. Do you remember how old you were when (the appellant) did that to you? A. Four. Q. And was it before Christmas or after Christmas? A. After. Q. Had you already gotten your presents? A. Yeah. . . . Q. . . . Let me ask you real quick, did (the appellant) ask you to touch him with any part of your body? A. (Shakes head negatively.) Q. Did he show you any dirty magazines or movies? A. (Nods head affirmatively.) Q. He did. Where were they? A. . . . He showed some bad things like he did to me. Q. Where did he show you those? A. At his house. Q. Was it on the TV or was it in a magazine? A. Magazine. . . . Q. Okay. And did Daddy put his private parts in your private parts more than one time? Do you understand? A. (Nods head affirmatively.) Q. How many times? A. (Indicating with five)."

Ms. Wise testified that during a later counseling session which took place in June of that same year, the child asserted that her daddy had not hurt her but that her mother's boyfriend, Bruce, had hurt her. Ms. Wise further stated that in September of that year, she asked the child "if anyone else had touched her like her daddy," and the child responded that her mommy's boyfriend, Charles, had done so. The appellant's parents testified that the child had told them that a man named Charles had had sex with her mother and had put his penis in her brother's behind and that she had also seen her mother having sex with a man named Stephen. While the mother acknowledged that she had dated men named Bruce and Charles and that each had "stayed over" in her home on at least one occasion while the children were present there, she asserted that the children had been in bed on these occasions and did not know where the men had slept. She further testified that she had never left the children alone with any of the men she had gone out with, that she had never discussed sex with her daughter, and that to her knowledge the child had never been exposed to sexual activity in movies, television, or magazines. The appellant had continued to visit his children and to participate in family activities with them and with their mother subsequent to the occurrence of the alleged abuse, and it was established without dispute that the daughter had been happy to see him and had displayed affection towards him during each of these visits.

1. Pursuant to OCGA § 24-3-16, "[a] statement made by a child under the age of 14 years describing any act of sexual contact or physical abuse performed with or on the child by another is admissible in evidence by the testimony of the person or persons to whom made *if the child is available to testify in the proceedings and the court finds that the circumstances of the statement provide sufficient indicia of reliability*." (Emphasis supplied.) As previously indicated, there appears to be no question in the present case that the appellant's daughter was "available to testify" during the trial, although neither

side asked the court to call her as a witness. Cf. *Sosebee v. State*, 257 Ga. 298 (357 SE2d 562) (1987). The appellant contends, however, that under the recent decision of the United States Supreme Court in *Idaho v. Wright*, ___ U. S. ___ (110 SC 3139, 111 LE2d 638) (1990), the admission of the two videotaped statements into evidence violated his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution, regardless of whether the requirements of OCGA § 24-3-16 were satisfied.

The Supreme Court made it clear in *Idaho v. Wright*, supra, that the Confrontation Clause "bars the admission of some evidence that would otherwise be admissible under an exception to the hearsay rule." The evidence at issue in that case was a statement made by a two-and-one-half-year-old child to a hospital pediatrician to the effect that her father had molested her. In determining whether the father's Sixth Amendment rights were violated by the admission of this evidence in his subsequent prosecution for "lewd conduct with a minor," the Court employed the following two-step approach previously adopted by it in *Ohio v. Roberts*, 448 U. S. 56 (100 SC 2531, 65 LE2d 597) (1980): " 'First, in conformance with the Framers' preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity. In the usual case . . . , the prosecution must either produce or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant.' Ibid. (citations omitted). Second, once a witness is shown to be unavailable, 'his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.' " *Wright*, supra at 111 LE2d 651-652.

The trial judge in *Wright* had ruled that the child was incapable of communicating with the jury, and this ruling had not been challenged by defense counsel. Accordingly, the Supreme Court assumed without deciding that to the extent the Confrontation Clause required the prosecution to show the unavailability of a child witness prior to introducing out-of-court statements made by her, that requirement had been satisfied. The Court then stated: "The crux of the question presented is therefore whether the State, as the proponent of evidence presumptively barred by the hearsay rule and the Confrontation Clause, has carried its burden of proving that the [child's] incriminating statements to [the physician] bore sufficient indicia of reliability to withstand scrutiny under the Clause." Id. at 652-653.

As previously noted, the Georgia statute, OCGA § 24-3-16, specifies that an out-of-court statement made by a child under the age of 14 years describing acts of sexual molestation or physical abuse is admissible in evidence "*if the child is available to testify in the pro-*

*ceedings* and the court finds that the circumstances of the statement provide sufficient indicia of reliability." (Emphasis supplied.) Thus, to the extent that the Confrontation Clause conditions the admissibility of such evidence on the child's *unavailability* to testify, it would appear that the requirements of our statute may conflict with the requirements of the Sixth Amendment. However, we need not resolve this issue in the present case, inasmuch as the circumstances surrounding the making of the videotaped statements at issue here fail, in our opinion, to establish their inherent reliability.

Like the statements at issue in *Wright*, the statements at issue in the present case do not fall within a "firmly rooted hearsay exception." Consequently, they are " 'presumptively unreliable and inadmissible for Confrontation Clause purposes,' [citation omitted] and 'must be excluded, . . . absent a showing of particularized guarantees of trustworthiness.' " Id. at 654, citing *Ohio v. Roberts*, supra, 448 U. S. at 66. The Supreme Court held in *Wright* that the relevant circumstances from which such "particularized guarantees of trustworthiness" must appear "include only those that surround the making of the statement and that render the declarant particularly worthy of belief." Id. at 655. The Court listed several factors which have been identified by state and federal courts as bearing on the reliability of hearsay statements made by child witnesses, including "spontaneity and consistent repetition," "use of terminology unexpected of a child of similar age," and "lack of motive to fabricate." Id. at 656. It then observed that "the unifying principle" surrounding these factors is that they all "relate to whether the child declarant was particularly likely to be telling the truth when the statement was made." Id. The Court rejected the state's contention that "particularized guarantees of trustworthiness" sufficient to satisfy a Confrontation Clause objection could be derived from independent evidence tending to corroborate a child's out-of-court statement, holding that "[t]o be admissible under the Confrontation Clause, hearsay evidence used to convict a defendant must possess indicia of reliability *by virtue of its inherent trustworthiness, not by reference to other evidence at trial.*" Id. at 657. (Emphasis supplied.) Concluding that the incriminatory statement made by the defendant's two-and-one-half-year-old daughter to the hospital pediatrician had not been "made under circumstances of reliability comparable to those required, for example, for the admission of excited utterances or statements made for purposes of medical diagnosis or treatment," id. at 660, the Court accordingly held that the statement was inadmissible.

We are constrained to conclude that the circumstances surrounding the making of the videotaped statements at issue in present case likewise fail to establish the inherent reliability of those statements. Although the appellant's daughter certainly used terminology which

would not be expected of a child her age and although she had no apparent motive to fabricate, her statements obviously do not meet the tests of "spontaneity and consistent repetition." In addition, some of the assertions made by her during the two videotaped interviews are inconsistent with the known facts. Furthermore, the interviews were conducted by persons acting in a law enforcement capacity, with the clear intention of gathering evidence for use against the appellant in subsequent criminal proceedings.

By the time the first of the two interviews took place, nine days had transpired since the occurrence of the events under investigation, and during that period the child had been questioned about the incident by several adults, including the officer who conducted the interview. As noted by the Supreme Court in *Wright*, even where a child's statements regarding alleged abuse appear on the surface to be spontaneous, "it is possible that '(i)f there is evidence of prior interrogation, prompting, or manipulation by adults, spontaneity may be an inaccurate indicator of trustworthiness.' " Id. at 659-660, citing *Arizona v. Robinson*, 735 P2d 801 (1987). By the time the second interview took place, over three months had transpired since the occurrence of the alleged incident; and the interviewer, who was acting with the avowed intention of "assist[ing] the police in their investigation of child sexual abuse" and "help[ing] to prepare [the child] for court testimony," had counseled the child repeatedly during that period. It is not our intention to imply that there was anything improper about this; however, the therapist's desire to assist the police and the prosecution in establishing a case against the appellant is, we believe, a factor which must be taken into consideration in determining whether "the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility. . . ." *Wright*, supra at 655. Considering the totality of the circumstances surrounding these two interviews, we are simply unable to discern such "particularized guarantees of trustworthiness" as would obviate the appellant's Confrontation Clause objection. Accordingly, we are constrained to hold that the trial court erred in admitting this evidence.

2. The appellant contends that the trial court erred in allowing the therapist to offer testimony concerning the "child sexual abuse accommodation syndrome" over his objection that the existence of such a syndrome had not been established to a verifiable scientific certainty. The witness testified that the "child sexual abuse accommodation syndrome" was generally considered to be a valid and useful model in explaining and predicting the behavior of child abuse victims, and there was no evidence suggesting that the theory was not scientifically valid. It appears that testimony concerning this syndrome has been permitted in numerous other child abuse cases in this

state. See *Allison v. State*, 256 Ga. 851 (2) (353 SE2d 805) (1987); *Hall v. State*, 196 Ga. App. 523 (2) (396 SE2d 271) (1990); *Braggs v. State*, 189 Ga. App. 275 (2) (375 SE2d 464) (1988); *Keri v. State*, 179 Ga. App. 664 (1) (347 SE2d 236) (1986). "Once a procedure has been recognized in a substantial number of courts, a trial judge may judicially notice, without receiving evidence, that the procedure has been established with verifiable certainty, or that it rests upon the laws of nature." *Harper v. State*, 249 Ga. 519, 526 (292 SE2d 389) (1982). Accordingly, we find this enumeration of error to be without merit.

3. The appellant contends that the trial court erred in refusing to admit into evidence a copy of a pamphlet published by the Georgia Center for Children, Inc., listing various symptoms of child sexual abuse. The appellant contends that because the child's therapist testified that she had observed few, if any, of these symptoms in the child, the pamphlet was relevant and admissible to impeach her testimony. However, it appears from the transcript that appellant's counsel was permitted to read the material in question in cross-examining this witness and to explore fully the extent to which the child had or had not displayed the symptoms in question. The court did not abuse its discretion under these circumstances in declining to admit the pamphlet itself into evidence. See generally *Bland v. State*, 174 Ga. App. 584 (3) (330 SE2d 796) (1985).

*Judgment reversed. Carley, P. J., concurs and Beasley, J., concurs specially.*

BEASLEY, Judge, concurring specially.

I do not concur in the statement in Division 1 suggesting that the Georgia statute "may conflict with the requirements of the Sixth Amendment." Moreover, the issue is not before us.

DECIDED NOVEMBER 15, 1991 —
RECONSIDERATION DENIED DECEMBER 3, 1991 — ■

*England, Weaver & Kytle, J. Melvin England*, for appellant.
*Robert E. Wilson, District Attorney, John T. Morgan III, Barbara B. Conroy, Assistant District Attorneys*, for appellee.