## S96A1626. CARR v. THE STATE.
(482 SE2d 314)

BENHAM, Chief Justice.

This appeal is from Weldon Wayne Carr's convictions of malice murder and first degree arson.[1] Carr's wife died in a fire in their home. He recounted to authorities that he awoke and realized there was a fire downstairs in their home; that he tried to get his wife to escape with him through a bedroom window, but she resisted and tried to go toward the fire; and that he lost her in the smoke and confusion after a struggle, but finally saved himself by jumping out of a second-story window. The State's theory of the case was that Carr set the fire, then injured his wife so that she could not escape. Although she died of smoke inhalation, Carr's wife suffered other injuries, including cerebral bleeding. Prior to the fire, the couple had been experiencing marital difficulty and had been seeing a marriage counselor. Ms. Carr was having an affair, of which Carr had learned, and she had told several persons that she intended to divorce Carr and marry her lover. In a short period before the fire, Carr engaged in conduct which appeared suspicious after the fire: checking on fire insurance; getting copies of his and his wife's will; telling their adult son, who resided elsewhere, to remove some of his belongings from

---

[1] Carr's wife died on April 7, 1993. An indictment returned November 30, 1993, charged Carr with malice murder; two counts of felony murder, with arson and aggravated assault as the underlying felonies; arson in the first degree; aggravated assault; and eavesdropping. Trial commenced on April 18, 1994, and ended May 10, 1994, with a verdict of guilty of malice murder, felony murder (arson), arson, and eavesdropping; and not guilty of felony murder (aggravated assault) and aggravated assault. Carr was sentenced to life imprisonment for malice murder (the felony murder conviction having been vacated by operation of OCGA § 16-1-7); twenty years for arson, concurrent; and one year for eavesdropping, also concurrent. A motion for new trial was filed by trial counsel on May 17, 1994, and was amended by appellate counsel on October 18, 1995, and on April 10, 1996. That motion was denied on May 15, 1996, and a notice of appeal was filed on May 17. The appeal was docketed in this Court on July 8, 1996, and was submitted for decision after oral argument on October 22, 1996. Appeal of the eavesdropping conviction was expressly waived.

the family home; putting valuables into a safe deposit box; and conducting an uncharacteristic spring cleaning of the house. To support its theory that Carr used an accelerant to start the fire, the State presented evidence that burn patterns at the site of the fire's origin were consistent with the use of an accelerant, and presented testimony that a dog trained to indicate the presence of chemical accelerants had alerted at the same site.

On appeal, Carr contends the trial court erred in the following ways: permitting evidence of a dog alerting to the possible presence of an accelerant as substantive evidence of the presence of an accelerant; ordering certain pre-trial discovery; admitting into evidence inadmissible hearsay testimony; improperly admitting bad character evidence; excluding defense evidence regarding the reliability of dog alert evidence; erroneously qualifying witnesses as experts; permitting testimony tainted by a warrantless search; refusing to record the entire proceeding; and improperly limiting the evidence presented on motion for new trial. He also contends his convictions must be reversed because of prosecutorial misconduct and because the evidence presented at trial was insufficient to support the convictions. After a review of the voluminous record and the extensive argument of counsel, we conclude that the convictions must be reversed for the reasons which follow.

1. The question of whether an accelerant had been used in the Carr house was an important point in the State's case. Testimony from firefighters was used to show that the progress of the fire and burn patterns in the house were consistent with the presence of an accelerant, but the State Crime Lab report on fire debris sent to it was negative for the presence of accelerants. However, the State proffered evidence that Blaze, a dog trained to give an alert when he smelled certain hydrocarbons, had given such an alert at the site in the house where investigators had already come to believe an accelerant was used. Carr argues on appeal that the evidence was inadmissible because there was no evidence at trial that dog alerts have reached a state of verifiable certainty as required by *Harper v. State*, 249 Ga. 519 (1) (292 SE2d 389) (1982), and that the error was harmful because it was the only substantive evidence purporting to show the presence of an accelerant. We agree.

Prior to permitting the testimony about the dog's alerts, the trial court conducted a hearing at which the State put on witnesses vouching for the reliability of the dog's alerts. The trial court concluded finally that the evidence should be admitted, ruling that the test in *Harper*, supra, was not applicable, but that if it were, the evidence submitted at the hearing was sufficient to meet that test.

The question of what type of evidence constitutes scientific test evidence which should be subjected to the *Harper* test has not been

directly decided by the appellate courts of Georgia, but the test has been applied to a wide range of evidence: a possible genetic basis for violent and impulsive behavior in certain individuals (*Mobley v. State*, 265 Ga. 292 (2) (455 SE2d 61) (1995)); breathalyzer tests (*Lattarulo v. State*, 261 Ga. 124 (3) (401 SE2d 516) (1991)); the phenomenon of sleep talk (*Godfrey v. State*, 258 Ga. 28 (365 SE2d 93) (1988)); analysis of fibers (*Williams v. State*, 251 Ga. 749 (1) (312 SE2d 40) (1983)); urinalysis for the presence of cannabinoids, using the SYVA EMIT 1000 test (*Smith v. State*, 250 Ga. 438 (298 SE2d 482) (1983)); penile plethysmograph evidence (*Gentry v. State*, 213 Ga. App. 24 (2) (443 SE2d 667) (1994)); the "ontrack system" for detecting alcohol and controlled substances (*Hubbard v. State*, 207 Ga. App. 703 (429 SE2d 123) (1993)); horizontal gaze nystagmus test for intoxication (*Manley v. State*, 206 Ga. App. 281 (424 SE2d 818) (1992)); and the "child sexual abuse accommodation syndrome." *Rolader v. State*, 202 Ga. App. 134 (2) (413 SE2d 752) (1991).

What these cases have in common is expert opinion based on an analysis of data, an opinion that could only be based on something more than mere observation. Of course, if the conclusion at issue could be drawn by anyone based on observation, there would be no need for expert testimony. "Expert opinion testimony . . . is admissible where the conclusion of the expert is one which jurors would not ordinarily be able to draw for themselves; i.e., the conclusion is beyond the ken of the average layman. [Cits.]" *Smith v. State*, 247 Ga. 612, 683 (277 SE2d 678) (1981). Applying that rationale to the evidence involved in this case, it is plain that the dog alert testimony was expert testimony in that the average layperson would not be able to determine from watching the dog lie down, point with his nose, or paw the ground (the methods used by the dog to indicate the presence of hydrocarbons) that chemicals which could accelerate a fire were present. It is only by the dog handler's analysis of the dog's behavior that the conclusion could be reached that an accelerant was present.

The dog handler's testimony concerning the presence of accelerants, based on the dog's alert, is conceptually indistinguishable from the other types of tests and analyses mentioned above. Therefore, the analysis and data gathering leading to the testimony should be subject to the same requirements of scientific verifiability applicable to the other procedures. See *Harper*, supra. To hold otherwise would make the dog alert procedure analogous to the earliest recorded lie detector, which involved touching a donkey's tail.[2]

---

[2] The first recorded lie detector test was in ancient India where a suspect was required to enter a darkened room and touch the tail of a donkey. If the donkey brayed when his tail was touched the suspect was declared guilty, otherwise he was

The trial court, in ruling the testimony admissible, concluded that if *Harper* did apply to this testimony, the requirements of that case were met by the State's evidence at the hearing held to consider admission of the testimony. The foundational evidence on the subject consisted of a recital of the dog's and the handler's training, background information on the use of dogs to detect chemical accelerants, and anecdotal evidence of the dog's success in tests. What was not presented was a showing "with verifiable certainty that these tests are an accurate and reliable means of ascertaining whether [an accelerant is actually present]." *Harper v. State*, supra at 526. The State also offered the trial court and has offered this Court case authority permitting the use of dog alert evidence, attempting to satisfy the provision in *Harper* that "[o]nce a procedure has been recognized in a substantial number of courts, a trial judge may judicially notice, without receiving evidence, that the procedure has been established with verifiable certainty, or that it rests upon the laws of nature." Id. at 526. The proffered authority, however, did not involve the use of dog alert testimony to show the actual presence of a substance. The State has not cited, and we have not found, any case in Georgia in which there has been such holding.[3] While the use of trained dogs can be a valuable part of investigative procedures and can provide important elements of probable cause to search (*Bothwell v. State*, 250 Ga. 573 (7) (300 SE2d 126) (1983); *Carter v. State*, 222 Ga. App. 345 (1) (474 SE2d 240) (1996)), dog alerts to accelerants have not been shown, neither at the trial of this case nor in any Georgia appellate decision, to have the scientific reliability necessary to permit their use as substantive evidence of the presence of accelerants. The trial court's ruling to the contrary was error.

The State argues that the admission of the evidence, if error, was harmless in light of other evidence of the presence of an accelerant. However, there was no other direct evidence of the presence of an accelerant, and thus, no direct evidence of arson. Notwithstanding the trial court's instruction that the evidence of the dog alert must be considered along with other evidence, we conclude that the potential impact of the evidence admitted was too great for us to conclude that no harm to Carr's right to a fair trial flowed from it. The erroneous

---

released. Modern science has substituted a metal electronic box for the donkey but the results remain just as haphazard and inconclusive.
*State v. Chambers*, 240 Ga. 76, 81 (239 SE2d 324) (1977) (Jordan, J., dissenting).

[3] The State did cite to the trial court an unreported decision of the Supreme Court of Delaware in which such evidence was permitted. *Reisch v. State*, Docket # 426, 1992, decided June 4, 1993. That court held, however, that there was no requirement of scientific testing if the evidence showed the qualifications of the handler; the dog's experience, skill, training, and reputation; and the circumstances of the dog's performance. Such a ruling is at odds with the policy of this State as expressed in *Harper*, supra, and we do not find it persuasive.

admission of that evidence requires a new trial.

2. In accordance with *Sabel v. State*, 248 Ga. 10 (6) (282 SE2d 61) (1981), the trial court ordered the defense to disclose to the prosecution the results of all scientific tests and experiments conducted by the defense. Carr complains the order had a chilling effect on the development of his defense in that he forewent certain testing because he could not be sure in advance that the test results would be positive for him.

In *Rower v. State*, 264 Ga. 323 (5) (443 SE2d 839) (1994), this Court overruled *Sabel* to the extent that it gives the State any discovery rights greater than those specifically granted to defendants by OCGA § 17-7-211. Although the *Sabel* order in the present case was correct when it was entered, *Rower* was decided just before the trial began. Thus, this case was " 'in the pipeline,' the *Rower* rule applies, and there was error." *Childress v. State*, 266 Ga. 425 (3) (467 SE2d 865) (1996). The State concedes that the order was erroneous under *Rower*, but contends that any error was harmless. Because we find it necessary to reverse the convictions in this case for the reasons stated in Division 1, supra, and because the tests were conducted after the trial and Carr will have the use of them for a retrial, if there is one, we need not decide whether the error in ordering full disclosure of the results of all tests and experiments conducted by the defense was harmful.

3. In the course of establishing Carr's possible motive for murdering his wife, the State presented considerable hearsay testimony concerning Ms. Carr's out-of-court statements. The four most noteworthy of the witnesses permitted to testify thus were Ms. Carr's sister, best friend, lover, and neighbor. In considering whether the testimony of those witnesses should have been admitted under the necessity exception to the hearsay rule (see *Mallory v. State*, 261 Ga. 625 (409 SE2d 839) (1991)), we conclude that the necessity element of the test enunciated in *Mallory* was met: the hearsay declarant is unavailable as a witness because she is dead. Id. The other element of the test, however, particularized guarantees of trustworthiness or indicia of reliability, was not satisfied by the testimony given at the trial of this case. To the extent that the trial court articulated the basis for concluding that the testimony exhibited indicia of reliability of the hearsay declarant's statements, that basis was that the witnesses were all Ms. Carr's "confidants." In *Mallory*, the witness was the victim's "best friend," and this Court found that insufficient as a basis for demonstrating the reliability necessary to authorize the admission of hearsay testimony under the necessity exception. We conclude that it was equally insufficient in the present case. A married person's complaints about that person's spouse, made to one with whom the married person is conducting an adulterous affair,

are subject to the possibility of exaggeration if not outright falsehood. Similarly, that same married person's conversations with confidants to whom the affair has been confessed are subject to doubt in that the need to justify the act of adultery might well lead to untruthfulness. Being Ms. Carr's confidants was not a sufficient basis for permitting the hearsay testimony of Ms. Carr's lover and friends.

A review of the record persuades us that the admission of Ms. Carr's sister's testimony was also error. In *Roper v. State*, 263 Ga. 201 (2) (429 SE2d 668) (1993), statements made to a sister of the victim, described as "a sister in whom she placed great confidence and to whom she turned for help with her problems," were found to have the necessary indicia of reliability. On the other hand, the Court of Appeals has held declarations made to a sister to be untrustworthy because of conflicting statements made by the declarant to others. *Boehm v. Abi-Sarkis*, 211 Ga. App. 181, 183 (438 SE2d 410) (1993). In the present case, the record reflects that Ms. Carr and her sister spoke infrequently and only on the telephone (the sister lives on the West Coast), and that statements recounted by the sister regarding Ms. Carr's stated intentions concerning the future of her marriage were inconsistent with statements allegedly made by Ms. Carr to her lover. Under those circumstances, we conclude that the record does not support a finding that the declarations allegedly made to the sister were accompanied by such indicia of reliability as would authorize admission of the sister's hearsay testimony. Id.

Given the circumstantial nature of the evidence in this case, and the emphasis in the State's presentation of the case on the state of the Carrs' marriage, we cannot consider the improperly admitted hearsay testimony to be harmless error. Its admission into evidence is reversible error independent of other error in this case. We do not hold, however, that the witnesses named in this division are barred from testifying; only that the reasons given by the trial court for admitting the evidence and the foundation laid by the State for its admission were insufficient. Should the State choose to retry Carr, the trial court must independently examine the circumstances attendant to each witness's testimony under the standards established by *Mallory* and subsequent cases addressing the issue.

4. Carr complains that the trial court permitted his character to be put in issue without his first having done so, in violation of OCGA § 24-9-20 (b).[4] The testimony to which he refers was from several witnesses, in addition to those mentioned in the discussion of hearsay testimony above, who were permitted to testify about Carr's behavior

---

[4] "[N]o evidence of general bad character or prior convictions shall be admissible unless and until the defendant shall have first put his character in issue. OCGA § 24-9-20 (b)."

as a husband and as a neighbor. Other witnesses were presented to testify about Carr's failure to grieve for his wife after her death. Our review of the record reveals that much of the testimony admitted under the guise of showing Carr's motive or demonstrating prior difficulties with his wife was not sufficiently relevant to those issues to permit their admission. Since we are reversing the conviction on other grounds, we will not detail the specific errors in admitting evidence regarding Carr's relationships with neighbors and friends, but will merely point out, in the event of a retrial, that evidence of prior difficulties between the defendant and the alleged victim must have some probative connection with the incident giving rise to the case being tried, "some link of association, something which draws together the preceding and subsequent acts, something which gives color of cause and effect to the transaction, and sheds light upon the motive of the parties . . . ." *Maxwell v. State*, 262 Ga. 73 (2) (b) (414 SE2d 470) (1992).

5. Carr complains that the trial court erred in ruling inadmissible certain evidence important to his defense. As to two of the four specified instances of exclusion, the record does not support his assertion. Carr contends the trial court sustained an objection to a defense expert's testimony about substandard wiring, but the only objection appearing in the record was to the use of a photograph of a switch box other than the one alleged to have been involved in the fire. Since Carr does not argue on appeal that the photo, as opposed to the testimony, should have been admitted, there is no issue for this Court to consider with regard to the testimony of the electrical expert. Carr also complains that the trial court refused to permit the defense to play a videotape for the jury, but does not indicate where in the record the videotape was excluded. Our review of the record has not shown that exclusion or a proffer of the tape by Carr so that its exclusion could be considered on appeal. An appellant has the burden of proving error by the record (*Griffin v. State*, 265 Ga. 552 (10) (458 SE2d 813) (1995)), and Carr has not done so with regard to the videotape.

With regard to the exclusion from evidence of a fingernail polish bottle which a defense witness would testify was found at the scene of the fire, Carr has borne that burden. The trial court sustained a chain-of-custody objection to the bottle, but the record demonstrates that the bottle was not a fungible item but was a distinct physical object identifiable by observation. As such, it was not subject to the requirement of showing a chain of custody. *Droke v. State*, 252 Ga. 472 (6) (314 SE2d 230) (1984). The exclusion of the exhibit on that ground was error.

To counter the State's evidence of a dog alerting to the presence of accelerants, Carr sought to direct questions on that topic to a

defense witness whom the trial court had qualified as an expert in fire investigation. The trial court sustained the State's objection that the witness was not qualified to testify on that subject because he was not trained as a dog handler. We agree with Carr that the sustaining of that objection was error. When the witness was qualified as an expert in fire investigation, he was qualified to testify regarding the whole field. See *Corbett v. State*, 266 Ga. 561 (2) (468 SE2d 757) (1996).

6. The trial court permitted two firefighters to testify about such matters as backdrafts, vapor explosions, fire origins, and the use of accelerants. Contending that those witnesses were not properly qualified as experts because they lacked appropriate education, Carr argues that the trial court erred in letting them testify as experts. Qualification as an expert requires that the witness be educated in a particular skill or profession, or derive knowledge from experience; formal education on the subject is not a prerequisite for expert status. *Brown v. State*, 245 Ga. 588 (1) (266 SE2d 198) (1980). A trial court has discretion in qualifying an expert, and its judgment will not be disturbed unless abused. Id. The witnesses at question had considerable experience as firefighters, 20 years for one and 13 for the other, and we find no abuse of the trial court's discretion in permitting them to testify as experts.

7. During the trial, the State brought in an expert witness from out-of-state to testify about the cause of the fire. Without the knowledge or participation of the defense, the prosecuting attorney presented an order to the trial judge permitting entry into Carr's home so that the expert could view the scene. The order, which specifically recognized that the premises remained in Carr's custody and control, stated that it was not for purposes of search and seizure. Nonetheless, a fire investigator, armed with that order, went to Carr's home with the witness and broke in. The witness testified that he had already formed an opinion of the cause of the fire, but that the opportunity to view the fire scene confirmed his opinions.

When confronted with the witness and the information that the witness had been in Carr's house by virtue of an order that the defense had not seen, indeed had not known existed, Carr sought to exclude the testimony as being tainted by an illegal search. The trial court refused to do so, finding the ex parte procedure to be analogous to obtaining a subpoena, and ruling that Carr had no privacy interest in the house. The court subsequently agreed that entering the house was a search, but decided that it had been authorized to permit the entry on the basis of a week and a half of testimony by unspecified witnesses. We conclude from a review of the record and the law of search and seizure that the trial court erred in signing the order and in permitting the witness to testify.

The United States Supreme Court . . . addressed the issue of whether and to what extent a defendant may assert a privacy interest in fire-damaged property, reaching the following conclusions: "Privacy expectations will vary with the type of property, the amount of fire damage, the prior and continued use of the premises, and in some cases the owner's efforts to secure it against intruders. Some fires may be so devastating that no reasonable privacy interests remain in the ash and ruins, regardless of the owner's subjective expectations. The test essentially is an objective one: whether 'the expectation [is] one that society is prepared to recognize as "reasonable."' [Cits.] If reasonable privacy interests remain in the fire-damaged property, the warrant requirement applies, and any official entry must be made pursuant to a warrant in the absence of consent or exigent circumstances." See *Michigan v. Clifford*, 464 U. S. 287, 292 (104 SC 641, 78 LE2d 477) (1984).

*Pervis v. State*, 181 Ga. App. 613 (1) (353 SE2d 200) (1987). Unlike the building involved in *Pervis*, which was entirely destroyed, the house here was not destroyed by the fire. It belonged to Carr and had been secured against unauthorized entry, a state amply demonstrated by the fact that the front door had to be broken in order to effect entry as permitted by the trial court's order. We conclude that Carr retained a privacy interest in the dwelling, and that since he gave no consent for the entry and there were no exigent circumstances, a warrant was required. Id.

We cannot agree with the trial court that the procedure used here was sufficiently analogous to obtaining a search warrant that the order permitting entry should be considered a warrant. There was no affidavit by a certified law enforcement officer stating the reasons giving rise to probable cause that evidence would be found there. See OCGA § 17-5-21. We do not consider the testimony heard by the trial court at trial to be an adequate substitute for the "written complaint . . . under oath or affirmation . . ." required by that statute. The trial court did not specify that it considered only the testimony of certified officers, and this Court cannot evaluate the information on which the trial court based its order.

The State's argument that, even if there was a search, nothing was seized and, therefore, no harm was done, ignores the fact that the expert witness for whose benefit Carr's front door was broken testified that what he saw there confirmed his opinion. While no tangible articles were seized, the illegal presence of that witness directly benefited the State's case and prejudiced Carr. We conclude that the witness's testimony that his opinion was confirmed by his view of the

scene was tainted by his participation in the illegal search and should have been excluded on Carr's motion. If there is a retrial, this witness's testimony must be limited to the opinion he formed prior to the search, without reference to having visited the scene of the fire.

8. Because of the physical arrangement of the courtroom, anything audible to the court reporter was audible to the jury as well. The trial court resolved the problem by ruling that bench conferences would not be recorded unless counsel specifically requested they be at the time. Carr contends now that he was denied his statutorily mandated right of complete recordation of his trial. Since we are reversing his conviction, and there is no way to know whether he will be retried, if at all, in a courtroom with the same problem, we need not decide whether he was harmed by the absence from the record of all bench conferences and the ruling made at those conferences. We will note first that the procedure provided for in OCGA § 5-6-41 (f) is not an effective substitute for recordation where, as here, the State cannot or will not agree to any of the defense efforts to reconstruct what happened at the bench. We also note that OCGA § 5-6-41 (a) requires that, "[i]n all felony cases, the transcript of evidence and proceedings shall be reported . . .," and that subsection (d) of that statute requires that "all motions, colloquies, objections, rulings, . . . and all other proceedings which may be called in question on appeal . . . shall be reported . . ., it being the intention of this article that all these matters appear in the record."

9. Carr's complaints concerning the proceedings on his motion for new trial need not be addressed in light of the fact that his conviction is being reversed.

10. Carr devotes considerable argument in his brief on appeal to the topic of prosecutorial misconduct. The alleged misconduct of the prosecuting attorney included participation in and facilitation of unauthorized entries into Carr's home, once in person to film a CNN television special featuring the prosecuting attorney, and again by drafting and procuring the trial court's signature on the order discussed in Division 7, supra; suppressing evidence not supportive of the State's theory of the case; withholding information that two witnesses, Ms. Carr's lover and Ms. Carr's best friend, had entered into a romantic relationship by the time of trial; withholding information that the prosecuting attorney and some of the witnesses were expending personal funds to obtain evidence for the prosecution; abusing the subpoena process; withholding the complete witness list until the eve of trial; making statements in the opening argument about physical abuse which the prosecuting attorney knew would not be permitted in evidence; and making improper closing argument in which the prosecuting attorney again made arguments not supported by the evidence and repeatedly vouched for the State's theory of the

case by asserting her personal beliefs. The trial court considered many of these same allegations in post-trial proceedings and found that some of the conduct was not misconduct and that the misconduct which did take place did not deny Carr a fair trial.

Our review of the record supports Carr's contention that the prosecuting attorney engaged in an extensive pattern of inappropriate and, in some cases, illegal conduct in the course of the trial. Specifically, his allegations about illegal entries into his home are borne out by the record; the trial court, after a hearing on a motion to suppress evidence gathered through illegal use of subpoenas, specifically found that the prosecuting attorney abused the subpoena process by, among other things, inserting false information regarding hearing dates; the record shows that the witness list delivered on the eve of trial contained many names new to the defense (see *Bentley v. State*, 210 Ga. App. 862 (2) (438 SE2d 110) (1993));[5] the transcript of the opening argument shows that the prosecuting attorney repeatedly made references to physical abuse although the trial court had ruled out all evidence of purported abuse ("There is no occasion and no excuse for attempting to influence the jury in advance by improper statements as to evidence which counsel knows he cannot prove or will not be permitted to introduce." *Rodriguez v. State*, 184 Ga. App. 819 (1) (363 SE2d 23) (1987)); and the closing argument was replete with references to the prosecuting attorney's beliefs ("It has long been the rule that a district attorney may not state to the jury his personal belief in the defendant's guilt." *Castell v. State*, 250 Ga. 776 (8) (a) (301 SE2d 234) (1983)) and patent misrepresentations of fact such as the prosecuting attorney's use of a chart falsely indicating that a defense expert had not disagreed with a specific opinion by a State's witness (see OCGA § 17-8-75).

We conclude that the conduct of the prosecuting attorney in this case demonstrated her disregard of the notions of due process and fairness, and was inexcusable. Because we are reversing the convictions on other grounds, and because Carr has gotten the relief he sought in raising these issues on appeal, we need not conduct an analysis to determine whether the misconduct of the assistant district attorney who tried this case was so harmful as to require reversal. We trust, however, that if this case is to be retried, the prosecut-

---

[5] The State's argument on appeal that there was no harm because the defense was aware of half of the names on the list does not persuade us that there was no wrongdoing. We wish to register our stern disapproval of tactics which give rise to the appearance that the prosecution, by act or omission, has attempted to subvert or circumvent the right of an accused to have reasonable pretrial "access to evidence," [cit.], as that right is protected by the Georgia and U. S. Constitutions, the statutes of this State, and the Uniform Superior Court Rules. *Bentley v. State*, supra.

ing attorney and the trial court will bear in mind the special responsibility of a prosecuting attorney:

> "The responsibility of a public prosecutor differs from that of the usual advocate; his duty is to seek justice, not merely to convict." Rules and Regulations of the State Bar of Georgia, EC 7-13; 241 Ga. 643, 700 (1978). " 'While the safety of society requires the faithful prosecution of offenders against the laws, the State does not ask their conviction but upon calm and dispassionate investigation of the charges against them.' [Cit.]"

*Burns v. State*, 172 Ga. App. 645, 647 (324 SE2d 197) (1984).

> "It has often been stated that it is the duty of a prosecuting attorney to see that justice is done and nothing more. That duty should not be forgotten in an excess of zeal or the eager quest for victory in his case. The people of the state desire merely to ascertain beyond a reasonable doubt that the accused is guilty of the crime charged, and do not countenance any unfairness upon the part of their representatives in court." [Cit.]

*Rodriguez v. State*, supra.

11. In Carr's final enumeration of error, he contends that the evidence presented at trial was insufficient to support his convictions. The State's evidence, though circumstantial, was sufficient to authorize a rational trier of fact to find him guilty of malice murder and arson. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979); *Mallory v. State*, supra, Division 3.

*Judgment reversed. All the Justices concur.*

DECIDED MARCH 10, 1997 —
RECONSIDERATION DENIED APRIL 3, 1997.

*Millard C. Farmer, Jr., Joseph M. Nursey, Cozen & O'Connor, Michael A. McKenzie, Garland, Samuel & Loeb, Donald F. Samuel,* for appellant.

*Lewis R. Slaton, District Attorney, Rebecca A. Keel, Carl P. Greenberg, Assistant District Attorneys, Michael J. Bowers, Attorney General, Paula K. Smith, Senior Assistant Attorney General,* for appellee.