## A01A0632. MITCHELL v. THE STATE.
### (551 SE2d 404)

Phipps, Judge.

A White County jury found Paul F. Mitchell III guilty of armed robbery, three counts of kidnapping, and three counts of false imprisonment.[1] Mitchell complains of prosecutorial misconduct, ineffective assistance of counsel, and an erroneous jury charge. He also claims that the verdict is contrary to and against the weight of the evidence. After review, we affirm.

The evidence, when viewed in the light most favorable to the verdict, established that several days before Thanksgiving in 1997, the Leggs-Hanes-Bali factory outlet store in Helen was robbed by a lone man purportedly armed with a bomb-like device that was strapped inside his bulky coat. After directing an employee to empty a register, the perpetrator fled with the money, leaving three female employees tied up inside a rear storage room. The victims described the perpetrator as an older white male with "scraggly looking gray hair" and a predominately gray beard, who was wearing glasses, a burgundy-colored beret or tam-type hat, a gray bulky jacket, and a scarf. Based on their collective descriptions, a sketch artist drew a composite. In a dumpster behind the store, police found a gray parka, beret, glasses, and scarf. Dark green rope like that used to bind one victim was found in the lower left pocket of the gray parka.

Investigators obtained a major break in the case on the day after Thanksgiving, when a hiker found what appeared to be an abandoned campsite on a mountainside near Helen. In addition to several items of clothing, the hiker found a wallet belonging to Mitchell and turned it over to the Helen Police Department. When an officer noticed the remarkable similarity between Mitchell's photo identification and the composite sketch of the suspect in the armed robbery, Mitchell became the focus of the investigation. In the opinion of Georgia Bureau of Investigation (GBI) Agent Wayne White, Mitchell's photo-

---

[1] At sentencing, the convictions for false imprisonment were merged with those for kidnapping.

graph bore an "overwhelming striking resemblance" to the composite drawing.

Mitchell was traced to his mother's home, his normal place of residence. Clarisse Mitchell confirmed that in November, her son had left on a hiking trip. She recalled that on November 24, after receiving a telephone call from her son, she drove to Helen and picked him up just outside of Helen. When she picked him up, Mitchell appeared tired, unkempt, dazed, and confused. According to entries in the investigative notes of Deputy Sheriff Sherman McIntyre, Clarisse Mitchell remembered that on his hiking trip, her son had taken his gray hooded coat, plaid scarf, some gloves, glasses, painting supplies, and black canvas boots.

On December 10, Mitchell voluntarily provided a detailed, two-page statement, thoroughly incriminating himself in the crimes. Deputy McIntyre testified that before implicating himself Mitchell was fully advised of his *Miranda* rights. While Mitchell recounted the sequence of events, both McIntyre and Agent White took notes. McIntyre testified that "[Agent White] read [the statement] and showed it to him and they read it together." Mitchell made a single addition at the end of the document.

Agent White confirmed that he had apprised Mitchell of his *Miranda* rights twice. In acknowledging his rights, Mitchell initialed next to each declaration and signed a standard GBI waiver form. White emphatically denied promising any benefits or threatening Mitchell in any way. After completing the formal advisement of rights, White asked Mitchell to "tell me in your own words about this." Then, as White explained, "I wrote out what he related to me, in essence he dictated to me what he wanted to say, I wrote it out. . . ." According to this statement:

Just prior to Thanksgiving of 1997, I was camping on a hill across from Helen, Georgia. I was cold, hungry, and had no way to get home. I was miserable. I saw the lights of Helen, went down the hill to a two lane street and across the creek to the stores of Helen. I did something totally out of character for me because I was so hungry and desperate. I went in the Hanes store, had the three ladies working there to come to the front, told them I had a bomb and to give me the cash from the cash register. After taking the cash from the three ladies, I told them I was desperate or I would not be robbing them. I put the three ladies in the storage room and tied them up. I tied two of the ladies with a soft macrame cord, and the third with a piece of ribbon. One of the ladies unlocked the back door of the storage room and let me out. I was dressed in a large gray parka type coat, dark colored

plaid scarf, maroon beret, and hiking boots. I put the gray coat, plaid scarf and glasses in a dumpster in an alleyway behind Hanes. . . .

This statement also incorporated other details including information about his contacting his mother for a ride home. Mitchell added an incongruous disclaimer: "[t]he evidence is true in showing I did this. I agree that I did this. However, I don't remember everything or anything."

1. Mitchell contends that the State engaged in prosecutorial misconduct by failing to disclose exculpatory evidence that the three victims were unable to identify him as the perpetrator. He alleges that the State violated *Brady v. Maryland*[2] by failing to reveal this information before the conclusion of his trial. We disagree.

The three victims testified at trial and each underwent cross-examination. C. H. testified about the appearance, manner, and clothing of the robber and also described the device that appeared to be a bomb. C. H., however, was never asked on direct or during cross-examination whether she recognized Mitchell as the perpetrator or otherwise thought that he was the robber. From C. H., the defense elicited information to suggest that flawed investigative procedures resulted in a tainted composite sketch.

Although T. M. was able to recall specific details of the robber's appearance and his actions, she could agree only that Mitchell was the only person in the courtroom having "similar features" to the perpetrator. Similarly, while M. T. was able to narrate the events, as to identifying the robber, she expressed uncertainty and could testify only that Mitchell was "possibly" the robber.

During closing argument, defense counsel urged that Mitchell was a victim of a frame-up and a sloppy investigation and had mistakenly been targeted by the GBI. Mitchell's defense centered on a scenario that while at his campsite, he was robbed, knocked unconscious, then someone impersonated him in committing the robbery. Then, while Mitchell was still convalescing from his head injury, interrogators aided by Mitchell's nephew were able to twist his remarks to implicate him in crimes he did not commit. Counsel scoffed at the ambivalent and equivocal identification by the victims. Counsel pointed out that C. H. "doesn't even identify Mr. Mitchell in the courtroom. She's never done anything to identify Mr. Mitchell as the perpetrator of this crime." After disparaging the uncertain identification made by the other two employees, counsel argued: "Well, I submit to you, ladies and gentlemen, that they were the only three in

---

[2] 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963).

that store that night, and if that is the best that this State, this table can do, you've got to let my client go. He's entitled to that. This is ridiculous."

Without question, *Brady* imposes an affirmative obligation upon the State to timely provide material evidence in its possession that is favorable to a defendant, including evidence useful for impeachment to show the bias or interest of a witness.[3] But a crime victim's inability to visually recognize her attacker is not necessarily exculpatory, particularly when that victim can identify the perpetrator by another means, such as by his clothing, manner, or voice.[4]

Long before trial, the defense knew the identities of the victims. An amended statement of service filed March 8, 1999, indicates that the State served the defense with copies of the written statements of each victim. At the motion for new trial hearing, Mitchell's appellate counsel tried to establish that the victims had informed the district attorney's office that they could not identify the perpetrator and that the prosecutor had deliberately concealed this information. In support of the purported violation of *Brady,* Mitchell offered three identical post-trial affidavits from the victims, all of whom testify that "[d]ue to the time between the robbery and my testimony in court, I was unable to identify Paul F. Mitchell, III, as the man that robbed the Hanes Outlet. I made the prosecutors aware of this fact prior to testifying in court." Nevertheless, during the hearing, both T. M. and M. T. denied ever telling anyone that Mitchell was not the perpetrator. On deposition, C. H. repeatedly testified that she could not remember ever telling anybody in the district attorney's office that she could not identify the robber. None of the witnesses retracted or disavowed her trial testimony or ever testified that Mitchell was not the perpetrator.[5] These witnesses were present at trial and subject to cross-examination. No *Brady* violation or prosecutorial misconduct has been shown.[6]

2. Asserting five grounds, Mitchell claims that he was denied effective assistance of counsel at trial. To establish an ineffective assistance claim, an appellant must show not only that his counsel's performance was deficient but also that the deficiency so prejudiced him as to create a reasonable probability that but for counsel's errors, the outcome of the trial would have been different.[7] Failure to satisfy

---

[3] *Ferguson v. State,* 226 Ga. App. 681, 682 (2) (487 SE2d 467) (1997).

[4] See *Houston v. State,* 187 Ga. App. 335, 338 (3) (370 SE2d 178) (1988).

[5] See *Hightower v. State,* 227 Ga. App. 74, 77 (487 SE2d 646) (1997) (physical precedent only) (*Brady* disclosure required when the inconsistency is so self-contradictory as to contravene the entire impression or total effect of what is said or done).

[6] Compare *Carr v. State,* 267 Ga. 701, 711 (10) (482 SE2d 314) (1997).

[7] *Strickland v. Washington,* 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984); *Potter v. State,* 273 Ga. 325-326 (540 SE2d 184) (2001).

both requirements is fatal to an ineffectiveness claim.[8]

(a) Mitchell contends that he was harmed by his trial counsel's failure to seek a *Jackson-Denno* hearing. Although Mitchell argues that this "failure" is so egregious that he should be excused for not having raised the issue sooner, Mitchell cannot show that he was prejudiced by the lack of a formal *Jackson-Denno* hearing.[9] The evidence shows that Mitchell was informed of his *Miranda* rights before making the statement, and that the statement was made without threat of force or promise of reward. Because Mitchell failed to show that his statement was not voluntary, he cannot establish that his trial counsel was ineffective for not requesting a separate *Jackson-Denno* hearing.[10]

(b) Mitchell claims that his trial counsel should have objected to the admission of the "robbery note." Although a note was not used during the commission of the crimes that day, Mitchell's nephew provided a so-called "robbery note" to investigators. The decision not to object to the introduction of this note formed part of the trial strategy. Defense counsel testified that she did not object to the admission of the note because it dovetailed with part of the defense's theory that Mitchell's nephew "had sort of set him up."

Mitchell also faults his trial counsel for failing to object to Clarisse Mitchell's consent to the search of her home, failing to present any evidence on his behalf, and failing to object to the charge on a defendant's statement. Since the first two issues were not raised in the trial court, they were waived.[11] The last issue is addressed below.

3. Mitchell contends that the trial court erred by failing to charge on the difference between a confession and an admission.

An admission differs from a confession in that a confession includes acknowledgment of all the essential elements of the crime and an admission does not.[12] If a statement is an admission, the State must present additional direct and circumstantial evidence of a defendant's guilt; whereas, if a statement is a confession, the State must merely introduce additional evidence to corroborate it.[13]

Mitchell's incriminating remarks ended by saying, "[h]owever, I don't remember everything or anything." After instructing the jury on the State's burdens in proving the admissibility of a statement, the trial court essentially tracked the language in the pattern charge that requires other evidence to support a defendant's statement.[14] In

---

[8] *Brewer v. State*, 224 Ga. App. 656, 657-658 (2) (481 SE2d 608) (1997).

[9] See *Sanders v. State*, 245 Ga. App. 701, 703 (4) (c) (538 SE2d 772) (2000).

[10] *Powell v. State*, 210 Ga. App. 409, 414 (6) (c) (437 SE2d 598) (1993).

[11] *McCant v. State*, 234 Ga. App. 433, 436 (2) (506 SE2d 917) (1998).

[12] *Walsh v. State*, 269 Ga. 427, 429 (1) (499 SE2d 332) (1998).

[13] Id.; see OCGA § 24-3-53.

[14] Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, p. 32.

so doing, the trial court apparently opted to treat the entire statement as constituting an admission rather than a confession. Since this instruction was a correct statement of law and was adjusted to the facts, no error has been shown.[15]

4. Mitchell contends that the verdict was contrary to and against the weight of the evidence. We do not agree. The evidence establishing Mitchell's guilt was a blend of circumstantial and direct evidence. Circumstantial evidence proved that Mitchell had been present in the Helen area, had left Helen shortly after the crimes, and was the owner of clothing that matched the items of clothing worn by the robber and extracted from a dumpster near the crime scene. The composite sketch of the perpetrator resembled a photograph of Mitchell found in his wallet at a campsite near Helen. Other evidence showed that Mitchell, a white male, age 53 at the time of the crimes, matched the gender, age, and general appearance of the perpetrator, a gray haired, older man with a beard. The victims testified without contradiction that the robber displayed a device appearing to be a bomb, threatened to detonate it, and forced them into a storage area where he tied them up. Mitchell admitted committing the crimes, even explaining why he had done so. This evidence was sufficient to sustain the convictions.[16]

*Judgment affirmed. Smith, P. J., and Barnes, J., concur.*

DECIDED JUNE 29, 2001.

*Stanley R. Lawson,* for appellant.
*N. Stanley Gunter, District Attorney, Lynn Akeley-Alderman, Assistant District Attorney,* for appellee.

[15] See *Shuman v. State,* 244 Ga. App. 335, 336 (2) (535 SE2d 526) (2000).
[16] See *McCluskey v. State,* 211 Ga. App. 205, 207-208 (2) (438 SE2d 679) (1993).